**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James L. WILLIAMS,
Defendant–Appellant.**

No. 87–5290.

United States Court of Appeals,
Eleventh Circuit.

Feb. 17, 1988.

---

Michael J. Rosen, Miami, Fla., for defendant-appellant.

Leon B. Kellner, U.S. Atty., Miami, Fla., Michael Paup, Chief, Appellate Section, Tax Div., U.S. Dept. of Justice, Michael C. Durney, Tax Div., Dept. of Justice, Robert E. Lindsay, Gail Brodfuehrer, Washington, D.C., for plaintiff-appellee.

Before RONEY, Chief Judge, KRAVITCH, Circuit Judge, and HENDERSON, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

## I. BACKGROUND

James Williams was convicted of income tax evasion in violation of 26 U.S.C. § 7201 and of signing a false tax return in violation of 26 U.S.C. § 7206(1). At trial, the government proceeded against Williams under what is commonly referred to as the "net worth" method of proof. In a net worth case, the government attempts to prove tax evasion through circumstantial evidence, by showing an increase in the defendant's net worth from a starting point to a finishing point, and by demonstrating that unreported taxable income was responsible for the increase. *See generally Holland v. United States*, 348 U.S. 121, 124–29, 75 S.Ct. 127, 129–32, 99 L.Ed. 150 (1954). In particular, the government must demonstrate that the "likely source" of the accretion in net worth was taxable income, not nontaxable sources such as gifts, loans, and inheritances. *Id.* at 137–38, 75 S.Ct. at 136.

In this case, the government sought to prove that the likely source of Williams' unreported income was the cash generated in bingo operations run by Williams through two corporations. Williams and his employees conducted bingo games that were sponsored by several different charities. Under the agreements between Williams and the charities, each sponsoring charity would receive $150 per bingo ses-

sion, regardless of the number of people who participated in any particular game. After each session, the sponsoring charity would receive a yellow sheet of carbon paper entitled "Income and Expense Report," stating the gross receipts, expenses paid, and net proceeds. Every yellow sheet introduced by the government at trial listed $150 as the net proceeds for the session, even though the gross proceeds fluctuated.

According to the government, the money obtained from these bingo games, less the $150 turned over to the charities after each game, funded an increase in Williams' net worth from 1979 to 1982. The government used December 31, 1978 as a starting point because Williams was adjudicated bankrupt on April 9, 1979, and the government was able to use the bankruptcy records to determine Williams' assets and liabilities at the beginning of 1979. To show that Williams enjoyed an increase in net worth by 1982, the government demonstrated that Williams or his bookkeeper, Marian Sandridge, deposited cash in a bank account of the Center Construction Company, another corporation controlled by Williams. This account was coded "492" by Williams and Sandridge.

The government also attributed to Williams two mortgages receivable, a condominium in California held in the name of Williams' wife, two joint bank accounts held by Williams and his wife, and a boat. The government attributed the condominium to Williams rather than his wife because Williams' wife was a homemaker who, the government argued, had no source of income sufficient to allow the purchase of a condominium. The check for the down payment on the condominium was drawn from the joint bank account, and mortgage payments were made either by checks from the "492" account or by cashier's checks purchased with cash in amounts too large to be attributable to Williams' wife. The government attributed the boat to Williams rather than to his businesses because the boat was kept at Williams' house, and the government could discern no reason why Williams' business operations would need a boat.

Williams defended on the theory that observable increases in his wealth derived from nontaxable sources such as large loans from Williams' father and large cash gifts to Williams' wife from her parents. Williams also argued that he had a lifetime habit of borrowing and repaying substantial sums of money from acquaintances, and that he had borrowed money during the period covered by the indictment. Williams contended that the cash deposits to the "492" account reflected the funds that Williams had borrowed from relatives and friends and had, in turn, lent to his businesses.

## II. EVIDENTIARY RULINGS

### A.

On appeal, Williams challenges several evidentiary rulings. Williams first argues that the trial court should not have admitted into evidence the carbon "Income and Expense Reports," or yellow sheets, that reflected each bingo session's gross proceeds, expenses, and net proceeds of $150 paid to the sponsoring charity. The government introduced the yellow sheets under the "business records" exception to the hearsay rule, Fed.R.Evid. 803(6).[1] The government sought to introduce the yellow sheets not as business records of Williams' operations, but as records of the Paralyzed Veterans' Association (PVA), one of the

---

1. Fed.R.Evid. 803(6) provides that the hearsay rule does not exclude the following:
   (6) Records of regularly conducted activity
   A memorandum, report, record, or data compilation in any form, of acts, events, conditions, opinions, diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

sponsoring charities. The prosecutor attempted to lay a foundation for the yellow sheets through the testimony of Lawrence Seymour, an administrative assistant for the PVA. Seymour's testimony suggested, however, that he did not make out the originals to the yellow sheets and that he had no personal knowledge of the accuracy of the yellow sheets. Williams' attorney objected to the introduction of the yellow sheets for lack of the foundation required by Rule 803(6). The court overruled the objection, holding that the yellow sheets were in "substantial compliance" with Rule 803(6).

On appeal, the government largely concedes that the yellow sheets were not admissible under Rule 803(6). The government contends, however, that we should nonetheless affirm because the reports were admissible as admissions by a party-opponent, either by Williams himself under Fed.R.Evid. 801(d)(2)(A),[2] or by Williams' agents, under Fed.R.Evid. 801(d)(2)(D).[3] Williams replies that the government should not now be permitted to advance a theory of admissibility that it never relied on, and that the district court never ruled on, at trial. Williams further argues that the yellow sheets are not admissible under Rule 801(d)(2) for lack of a foundation.

Under some circumstances, when a trial court incorrectly admits evidence over the well-founded objection of a defendant, the court of appeals should not affirm the conviction even though the evidence was admissible on another theory not pressed below.[4] In *Shepard v. United States*, 290 U.S. 96, 54 S.Ct. 22, 78 L.Ed. 196 (1933), the Supreme Court reversed the murder conviction of an army major based largely on his wife's statement, made prior to her death, that "Dr. Shepard has poisoned me." The Supreme Court held that this statement was not admissible under the "dying declarations" exception to the hearsay rule because Mrs. Shepard had not made the statement in the shadow of imminent death.[5] *Id.* at 100–01, 54 S.Ct. at 24. The government alternatively argued to the Supreme Court that the statement was admissible to show Mrs. Shepard's state of mind; the statement could rebut the testimony of Dr. Shepard's defense witnesses that Mrs. Shepard had been of suicidal bent. The Supreme Court refused to consider a theory advanced for the first time on appeal:

Here the course of the trial put the defendant off his guard. The testimony was received by the trial judge and offered by the government with the plain understanding that it was to be used for an illegitimate purpose, gravely prejudicial. A trial becomes unfair if testimony thus accepted may be used in an appellate court although admitted for a different purpose, unavowed and unsuspected. Such at all events is the result when the purpose in reserve is so obscure and artificial that it would be unlikely to occur to the minds of uninstructed jurors, and even if it did, would be swallowed up and lost in the one that was disclosed.

*Id.* at 103, 54 S.Ct. at 25 (citation omitted); *see also United States v. Check*, 582 F.2d

---

2. Fed.R.Evid. 801(d)(2)(A) provides:
   A statement is not hearsay if—
   The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity....

3. Fed.R.Evid. 801(d)(2)(D) provides:
   A statement is not hearsay if—
   The statement is offered against a party and is ... (D) a statement made by the party's agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship....

4. This case does not implicate the well established rule that "a specific objection made on the wrong grounds and overruled precludes a party from raising a specific objection on other, tenable grounds on appeal." 1 J. Weinstein & M. Berger, *Weinstein's Evidence* 103–25 to –26 (1987). In this case, Williams presented a tenable objection to the introduction of the yellow sheets at trial, and the trial court incorrectly overruled the objection. Here the government requests us to affirm the trial court on grounds not presented below.

5. The current version of the "dying declarations" exception, Fed.R.Evid. 804(b)(2), is considerably more liberal than the common-law exception applicable at the time of the *Shepard* case, but admissibility still depends on the declarant's belief that death was imminent at the time of the statement. *See* 4 J. Weinstein & M. Berger, *Weinstein's Evidence* at 804–112.

668, 681–84 (2d Cir.1978) (introduction of prior consistent statements not admissible under any exception to rule against hearsay required reversal even though government argued on appeal that statements were admissible as nonhearsay verbal acts).

The *Shepard* decision, however, does not necessarily prohibit the courts of appeals from affirming the admission of evidence on grounds not advanced below under all circumstances. As the above-quoted *Shepard* excerpt indicates, the basic unfairness in that case derived from the government's attempt to justify the admission of Mrs. Shepard's statement on a theory wholly unrelated to the ground advanced at trial.

The Second and Third Circuits have held that the *Shepard* rationale does not apply when the evidentiary grounds relied on by the government at trial and on appeal serve the same purpose. In *United States v. Rosenstein*, 474 F.2d 705 (2d Cir.1973), the government introduced documents at trial under the business records exception to the hearsay rule. The Second Circuit concluded that the documents were not properly admitted under that exception because the government had introduced no testimony by anyone familiar with the business practice to the effect that the records were made as part of that practice. *Id.* at 710. Nonetheless, the Second Circuit held that the documents could have been admitted as admissions of the defendant. *Shepard* did not require reversal, for both justifications for the admission of the documents served the same purpose, namely the establishment of the truth of the matter asserted. *Id.* at 711. The basic unfairness in *Shepard*, where the government advanced on appeal a theory wholly unlike the one presented to the trial court, was therefore not present in *Rosenstein*. *Accord United States v. Provenzano*, 620 F.2d 985, 993 & n. 10 (3d Cir.) (adopting reasoning of *Ro-*

*senstein* ), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980).

■ In our view, the rule of *Rosenstein*, rather than *Shepard*, is applicable to this case. Although business documents are admissible under an exception to the rule against hearsay whereas admissions of a party may be introduced as nonhearsay, both evidentiary rules serve the same purpose—to permit the introduction of evidence proving the truth of the matter asserted. *See Rosenstein*, 474 F.2d at 711. Here the government relied on the yellow sheets to establish that Williams' bingo games always remitted $150 to the sponsoring charity, regardless of the amount of the gross receipts. Either Rule 803(6) or Rule 801(d)(2) could have supported the introduction of the yellow sheets, had the government laid a proper foundation.[6] Moreover, the connection between the two rules is not at all obscure; much evidence can be introduced either as a business record or as the admission of a party opponent. *Cf. United States v. Evans*, 572 F.2d 455, 488 (5th Cir.) (entries on pocket appointment calendars probably admissible under both theories), *cert. denied*, 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978).[7]

■ Williams argues, however, that the yellow sheets were not admissible as admissions by a party-opponent under Rule 801(d)(2) because the government never laid a foundation for them under that theory. Williams points out that admissions by the agent of a party-opponent require, as a foundation, some proof of the agency relationship. *See United States v. Pacelli*, 491 F.2d 1108, 1117 (2d Cir.), *cert. denied*, 419 U.S. 826, 95 S.Ct. 43, 42 L.Ed.2d 49 (1974). In this case, however, the government did not have to rely on Rule 801(d)(2)(D), for the yellow sheets could have been admitted as admissions of Williams himself under Rule 801(d)(2)(A). Several of the sheets bore what appeared to be the initials "JW"

---

**6.** The government might have been able to rely on Rule 803(6) to introduce the yellow sheets as business records of Williams' bingo operations, if it had introduced the testimony of a witness with personal knowledge that Williams or his employees compiled the yellow sheets as a matter of regular practice.

**7.** The Eleventh Circuit, in the in banc decision *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), adopted as precedent decisions of the former Fifth Circuit rendered prior to October 1, 1981.

or "J" at the bottom. When asked whose initials were at the bottom of the yellow sheets, Marian Sandridge, Williams' bookkeeper, replied, "JW looks like James Williams." Sandridge also testified that the initials appeared to be in Williams' handwriting. This testimony provided a foundation for the introduction of the yellow sheets as Williams' admissions.

■ Nor is it fatal to the admissibility of the yellow sheets that Sandridge's testimony provided the foundation after the evidence was already admitted. If the government had actually proceeded under Rule 801(d)(2)(A), the trial court could have permitted it to introduce the evidence before laying the foundation. As the Supreme Court has explained, the order of proof in a trial is in the discretion of the trial court. *See Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976); *Goldsby v. United States,* 160 U.S. 70, 74, 16 S.Ct. 216, 218, 40 L.Ed. 343 (1895).[8] This court has upheld convictions returned after trials in which

the prosecution introduced admissions of a co-conspirator under Fed.R.Evid. 801(d)(2)(E) before making the required showing that the conspiracy embraced both the defendant and the declarant and that the statement was made in furtherance of the conspiracy. *See, e.g., United States v. Haimowitz,* 725 F.2d 1561, 1575 (11th Cir.), *cert. denied,* 469 U.S. 1072, 105 S.Ct. 563, 83 L.Ed.2d 504 (1984).[9] Although the need for flexibility in the order of proof may be particularly great when a party seeks to introduce the statement as a co-conspirator's statement, in that the existence of a conspiracy may not be provable until later in the trial, the need for flexibility in the introduction of a party-opponent's admission is not so negligible as to warrant an iron rule of chronological offer of proof. We conclude that Sandridge's testimony provided a sufficient foundation for the introduction of the yellow sheets as Williams' admissions under Fed.R.Evid. 801(d)(2)(A).[10]

---

**8.** We do not read the Supreme Court's statement in *Bourjaily v. United States,* — U.S. —, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987), that "[b]efore admitting a co-conspirator's statement over an objection that it does not qualify under Rule 801(d)(2)(E), a court must be satisfied that the statement actually falls within the definition of the rule," as overruling this settled principle. In *Bourjaily,* the Court clearly used the word "before" in a conceptual, not a chronological sense. It remains true that the admissibility of statements under Rule 801(d)(2)(E) depends on the showing of the existence of a conspiracy, but in our view *Bourjaily* did not establish a strict requirement that demonstration of the conspiracy occur prior in time to the introduction of the admission at trial.

**9.** In *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), the Former Fifth Circuit held that the admission of a co-conspirator's statement under Fed.R.Evid. 801(d)(2)(E) depends on a showing (1) that there was a conspiracy; (2) that the statements were made during the course of and in furtherance of the conspiracy; and (3) that the declarant and the party-opponent were members of the conspiracy. *See James,* 590 F.2d at 578. The court further held that the trial judge, not the jury, must determine the admissibility of co-conspirator statements. *Id.* at 580. Although the court noted that it was preferable for the trial court to require the showing of a conspiracy and the connection of the defendant with it before admitting the statements, the court stated

that "[i]f [the trial court] determines that it is not reasonably practical to require the showing to be made before admitting the evidence, the court may admit the statement subject to being connected up." *Id.* If the trial court concludes at the end of trial, after admitting a co-conspirator statement into evidence, that the prosecution has not borne its burden of proof on the issue of admissibility, the court must decide whether the prejudice arising from the erroneous admission can be cured by a cautionary instruction to the jury or whether a mistrial is required. *Id.* at 583.

In *James,* the court further held that the trial court may not consider the co-conspirator statement itself when deciding whether the government has met the conditions of admissibility. *See James,* 590 F.2d at 581 ("[F]ulfillment of the conditions of admissibility must be established by evidence independent of the coconspirator statement itself."). The Supreme Court has since disapproved this aspect of *James* and has held that a trial court may consider the statement itself when deciding on its admissibility. *See Bourjaily,* 107 S.Ct. at 2779–81.

**10.** Some of the yellow sheets were subscribed merely with an "X" rather than "J" or "JW." Even if Sandridge's testimony did not provide a sufficient foundation for the introduction of these sheets, their admission was harmless error, for enough yellow sheets were admitted with Williams' subscription to sustain the conviction.

## B.

Williams further contends that the trial court violated his rights under the confrontation clause of the sixth amendment [11] by improperly restricting his cross-examination of Klaus Hurme, the government's special agent responsible for the investigation of his case. The government relied heavily on Hurme's testimony to prove Williams' taxable and nontaxable sources of income. Hurme testified about the investigation into Williams' financial affairs undertaken to establish a case against Williams.

Before Williams' indictment, Hurme had testified to the grand jury that Williams' taxable income for the years 1979, 1980, and 1981 was $337.00, $239,370.00, and $182,661.00, respectively. The first indictment returned against Williams reflected these figures. By the time the case reached trial, the indictment had been twice amended. The last amended indictment alleged that Williams sustained a loss of $21,329.00 in 1979 and had taxable income of $161,012.00 in 1980 and $155,961.00 in 1981. The government thus went to trial with a significantly diminished estimation of Williams' financial health. Williams argued to the trial court that this considerable reduction in the government's allegation of Williams' taxable income suggested troubling deficiencies in the government's investigation of Williams' affairs.

Williams' attorney sought to confront Hurme with the testimony, including the precise figures of Williams' income, that Hurme had given to the grand jury. The court, however, accepted the government's argument that the precise figures presented to the grand jury were irrelevant because the government did not have to prove the exact amount of tax due and owing in tax evasion cases such as this one. *See United States v. Johnson,* 319 U.S. 503, 517–18, 63 S.Ct. 1233, 1240, 87 L.Ed. 1546 (1943). The trial court precluded Williams' attorney from mentioning the figures given to the grand jury. Williams now argues that this restriction requires reversal.

Unquestionably the main purpose of the confrontation clause is to secure to defendants the opportunity for cross-examination. *Kentucky v. Stincer,* —— U.S. ——, 107 S.Ct. 2658, 2664, 96 L.Ed.2d 631 (1987); *Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). Nonetheless, trial judges retain wide latitude to impose reasonable limits on cross-examination to prevent interrogation that is confusing, repetitive, or marginally relevant. *See Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). "[T]he Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose [the] infirmities [in a witness' testimony] through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." *Delaware v. Fensterer,* 474 U.S. 15, 106 S.Ct. 292, 296, 88 L.Ed.2d 15 (1985) (per curiam); *accord United States v. Burke,* 738 F.2d 1225, 1227 (11th Cir.1984).

Here the trial court's ruling did not prevent Williams' attorney from exposing the inadequacies of Hurme's investigation. As the record reveals, the government's objection went only to mention of the precise figures given to the grand jury. The prosecutor specifically stated that Williams' attorney could ask Hurme if he had changed his mind about the attribution of any assets during the course of the investigation:

MR. GOLD: If he wants to ask if he is now not including—I don't have a problem with this, if Mike wants to ask the following question: Have you always included each of these assets all along the way? That is fine. The numbers aren't important.

If he wants to say, is he no longer attributing an asset that used to be attributed, I have no problem with that. That would go to his testimony. In terms of any numbers, that is different. If he wants to say, have you ever

---

11. "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him...." U.S. Const. amend. VI.

changed your mind about including the co[n]do; have you ever changed your mind about including Genie Investment, I think that is proper.

The numbers themselves, the only numbers that count are the ones presented here to the jury.

These remarks by the prosecutor convince us that Williams had ample opportunity through cross-examination to expose the infirmities of Hurme's investigation. By asking Hurme whether he had changed his assessment of Williams' net worth at any time, Williams' attorney could have effectively demonstrated the instability of the government's case to the jury. "Generally speaking, the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 106 S.Ct. at 295.

Moreover, Williams' attorney did question Hurme extensively about the gaps in his investigation. Counsel asked Hurme (1) whether he had talked to Williams' father; (2) whether he had questioned Williams' parents-in-law; (3) whether Hurme knew that Williams' mother-in-law had given cash to her daughter; (4) whether Hurme had discovered mistakes in the bookkeeping of Williams' companies; (5) whether Hurme tried to contact all persons who might have lent Williams money; (6) whether Hurme had considered the possibility that Williams might have borrowed money and in turn lent this money to his companies; (7) whether Hurme discovered that Williams' wife had declared the mortgages receivable characterized by the prosecution as Williams' assets on her own tax return; (8) whether Hurme had examined Williams' father's will to see if the will contained a debt forgiveness clause; and (9) whether Hurme knew that Williams' father owned tax-free bearer municipal bonds that would not have appeared on Williams' father's tax returns. Taken together, these questions and answers certainly tested the issue of the adequacy of Hurme's investigation. "The sixth amendment confrontation clause is satisfied where sufficient information is elicited from the witness from which the jury can adequately gauge the witness' credibility." *United States v. Burke*, 738 F.2d at 1227. We conclude therefore that the trial court's restriction of Williams' cross-examination of Hurme did not violate the confrontation clause.

III.

We also have considered Williams' contentions that the testimony of the government's expert witness was incompetent, irrelevant, and unduly prejudicial; that the trial court erred in refusing to give a requested jury instruction on Williams' habit of borrowing money; and that Williams' trial violated the double jeopardy clause of the fifth amendment because the trial court improperly declared a mistrial on the government's request at the first trial. We find no merit to these claims.

Accordingly, the judgment of conviction is AFFIRMED.