UNITED STATES of America, Plaintiff-Appellee,

v.

Frank DICKERSON, a.k.a. Lane, a.k.a. Frank Dixon, Defendant-Appellant.

No. 98-5829.

United States Court of Appeals,

Eleventh Circuit.

April 16, 2001.

Appeal from the United States District Court for the Southern District of Florida.

Before EDMONDSON and MARCUS, Circuit Judges, and RESTANI,* Judge.(No. 96-3760-CR-DMM), Donald M. Middlebrooks, Judge.

RESTANI, Judge:

Frank Dickerson ("Dickerson") appeals his conviction of conspiracy to possess cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (1994). In his appeal pursuant to 28 U.S.C. § 1291, Dickerson alleges prosecutorial misconduct, improper refusal by the District Court to strike a juror for cause, erroneous evidentiary rulings, an unlawfully coercive *Allen* charge given to the jury, and insufficient evidence to support conviction under the present charge. We affirm.

*I.     Facts*

From early 1988 Albert Nelson ("Nelson") operated a cocaine distribution conspiracy in the southeastern United States. *See United States v. Nelson,* No. 97-4741 (4th Cir.1998) ("*Nelson II*"), *cert. denied,* 528 U.S. 1197, 120 S.Ct. 1261, 146 L.Ed.2d 117 (2000); *United States v. Nelson,* No. 95-5706 (4th Cir.1996) ("*Nelson I*"). The Government obtained an indictment in October 1989 in Georgia against Nelson for conspiracy to distribute cocaine with intent to distribute. The charged conspiracy lasted from 1984 to 1989 and took place in Georgia, Florida, "and elsewhere." Nelson pled guilty to this conspiracy charge in 1992 and was incarcerated for 58 months. *See Nelson I.*

In 1995 the Government indicted Nelson in South Carolina upon learning that Nelson had been involved in cocaine distribution in states not covered by the 1989 indictment. Throughout his trial and even after his conviction, Nelson claimed that the new indictment violated the Double Jeopardy Clause of the Fifth Amendment. *See Nelson II.* The trial court, upheld by the United States Court of Appeals for the Fourth

---

*Honorable Jane A. Restani, Judge, U.S. Court of International Trade, sitting by designation.

Circuit, concluded that another prosecution was appropriate because of the multiple, independent conspiracies operated by Nelson in the different jurisdictions. *See Nelson I.*

In 1996, the Government charged another conspiracy against Nelson, Dickerson, Richard Williams ("Williams"), and two other defendants. The conspiracy charged covered late April 1988 to at least November 1991, but identified only one overarching conspiracy to distribute cocaine along the eastern seaboard. Testimony at trial, including that of the Government's key witness Williams, who had entered into a plea agreement, revealed the following additional information:

(1) Nelson was assisted in his criminal enterprise by Williams, who served as a courier in the cocaine distribution network. To facilitate Williams' deliveries, Nelson provided certain vehicles to Williams, in particular, a 1983 Cadillac Eldorado equipped with a secret compartment on the floorboard of the car. Beginning in late 1988, Williams delivered cocaine to Dickerson in Philadelphia. During one trip to Philadelphia in 1988, Dickerson accepted delivery of the cocaine at Williams' hotel. The arranged transaction took place after Dickerson arrived at the hotel, and the two men retrieved the cocaine from Williams' car in the hotel parking lot. Williams continued making cocaine deliveries to Dickerson regularly through the spring of 1990.

(2) After Nelson's March 1990 arrest following the October 1989 indictment, James Hanks assumed Nelson's responsibilities to manage the operations of the cocaine distribution conspiracy. Notwithstanding Nelson's arrest, Dickerson, Williams and Nelson financed the purchase of a house in Miami under the name "Frank Dixon." Hanks then assisted Dickerson and Williams in paying the mortgage on the house, which served as Dickerson's residence during his visits to Miami.

(3) Williams was stopped by the police during one of his deliveries in Georgia in September 1991. Inside Williams' car they discovered a small amount of marijuana, just under $20,000 cash, and a telephone/address book belonging to Hanks. Responding to a call from a Georgia trooper about the Williams stop, DEA Special Agent Kenneth McLeod reviewed the items removed from Williams' car and photocopied Hanks' telephone book before returning it to Williams.

(4) Hanks died in October 1991, and his funeral was attended by Williams, Kirkland, and Dickerson. At some point during the funeral, the three men met to discuss the deliveries that remained to be made after Hanks' death.

(5) Although Mark Sears ("Sears") had also worked as a courier for Nelson from 1987 to 1990, the Government introduced Sears to testify as to his relationship with Dickerson during the time period after the

charged conspiracy had ended.  After Hanks had taken over Nelson's operation, Sears operated his own cocaine distribution network.  Sears supplied Dickerson with cocaine from mid-1993 to early 1994.  In addition, Dickerson told Sears that the 1983 Cadillac Eldorado that had belonged to Nelson was now in Dickerson's possession.

II.    *Prosecutorial Misconduct as Violations of Due Process*

A.    *Giglio* Claims

Dickerson first claims the Government knowingly presented perjured testimony, thereby violating his Fifth Amendment Due Process rights under *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and their progeny.

Dickerson cites two instances of false testimony presented by the Government's key witness, Williams, and notes the Government's failure to correct the perjury before the court.[1]  First, when defense counsel questioned Williams as to the preparation he had received from the prosecution before testifying in the Dickerson trial, Williams denied being prepared.[2]  Subsequently, during cross-examination of Agent

---

[1]Dickerson also attempts to argue that the Government violated the tenets of *Giglio* and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by refusing to disclose a possible promise of immunity made to Williams by Assistant U.S. Attorney Marvin Caughman, and by allowing Williams to testify falsely that he did not know why he had not been prosecuted in other jurisdictions.  *See* Dickerson Reply Br. at 7. Because this argument was raised for the first time in Dickerson's Reply Brief, however, we decline to consider it here.  *See United States v. Martinez,* 83 F.3d 371, 377 n. 6 (11th Cir.1996), *cert. denied,* 519 U.S. 1133, 117 S.Ct. 998, 136 L.Ed.2d 877 (1997);  *United States v. Oakley,* 744 F.2d 1553, 1556 (11th Cir.1984).

[2]The following exchange took place between defense counsel and Williams:

> Q: By the way, before you came in and testified here yesterday and today, did you spend time with Agent Skrak going through all of these reports?
>
> A: No, I did not.
>
> Q: Did you go through them with anybody?
>
> A: No, I did not.
>
> Q: You had no preparation, just came in here cold and testified?
>
> A: Yes.
>
> Q: And you never—did you not meet with an agent or a prosecutor to go over your proposed testimony, is that what you are telling us under oath?
>
> A: That's correct.

R9-186 to 187.

Skrak, defense counsel questioned whether the Agent and prosecutors had met with Williams prior to trial "to prepare him for his day in court." R12-123. Agent Skrak responded that such preparation had taken place, but on re-direct examination, he clarified that Williams' preparation did not include "tell[ing] Mr. Williams what to say." R12-125.

Dickerson also points to Williams' testimony about his drug use as further evidence of perjured testimony uncorrected by the prosecution. When asked about his drug use, Williams testified as follows: that he stopped using cocaine in 1988, then "started back using [it] in 1995 to 1996," R9-12 to 13, 47; that he had only used cocaine "to stay awake," R9-165, 168 to 169; that he had never been treated for drug abuse, R9-182; and that he had tested positive only once for marijuana and cocaine since his arrest in this case, R9-47,50. At Williams' sentencing hearing, his counsel acknowledged that Williams had also tested positive for drug use only eight days before the opening of Dickerson's trial and that Williams had indeed entered a drug treatment program for thirty days. R17-6, 27 to 28

A successful *Giglio* challenge requires that the defendant establish that the prosecutor " 'knowingly used perjured testimony, or failed to correct what he subsequently learned was false testimony,' and that the falsehood was material." *Tompkins v. Moore,* 193 F.3d 1327, 1339 (11th Cir.1999) (quoting *United States v. Alzate,* 47 F.3d 1103, 1110 (11th Cir.1995)), *cert. denied,* --- U.S. ----, 121 S.Ct. 149, 148 L.Ed.2d 99 (2000). The materiality element is satisfied if the false testimony " 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Strickler v. Greene,* 527 U.S. 263, 290, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) (quoting *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995)).[3]

Even were we to accept Dickerson's contention that Williams testified falsely as to his pre-trial preparation by the prosecution[4] and his prior drug use, neither violation, when viewed independently or in

---

[3]Although *Strickler* discussed the materiality requirement in the context of a *Brady* violation, that is, a claim that the prosecution had not provided potentially exculpatory evidence to the defense, the articulated standard nevertheless remains relevant for the evaluation of materiality in a *Giglio* claim. *See Strickler,* 527 U.S. at 299, 119 S.Ct. at 1957 (Souter, J. concurring in part and dissenting in part) ("We have treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus have equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt.") (citing *United States v. Bagley,* 473 U.S. 667, 678-680 & n. 9, 105 S.Ct. 3375, 3381-82 & n. 9, 87 L.Ed.2d 481 (1985)).

[4]It is not clear that Williams committed perjury, particularly with regard to pre-trial preparation. As noted by the district court judge, the defense counsel's question—"Did you meet with an agent or prosecutor to go over your proposed testimony?"—could be understood to ask whether the witness had been "coached." R12-134. Thus, Williams' negative response is arguably a denial of having been unduly

conjunction with each other, can be said to "undermine confidence in the verdict." Any prejudice from Williams' arguably misleading affirmative response when asked if he had come into court "cold" to testify was dispelled during the cross-examination of Agent Skrak, who clearly stated that he and other Government agents had met with Williams prior to Williams' testimony. *Cf. Hays v. Alabama,* 85 F.3d 1492, 1499 (11th Cir.1996) (finding insufficient materiality where, *inter alia,* cross-examination elicited statements acknowledging inconsistency with testimony on direct examination), *cert. denied,* 520 U.S. 1123, 117 S.Ct. 1262, 137 L.Ed.2d 341 (1997).

At trial the Government did not correct Williams' testimony regarding his prior drug use; the falsehood became apparent only at Williams' sentencing hearing three months later. Thus, defense counsel was unable to highlight the falsity in impeaching Williams during cross-examination. Nevertheless, Williams did testify that he had tested positive once for drug use after his arrest. *See* R9-46-, 72-76, 105-108. Because Williams effectively admitted to ongoing drug use, an admission of an additional positive drug test subsequent to his arrest would not have tarnished his character or credibility further to any significant degree. Furthermore, the defense emphasized numerous possible inconsistencies in Williams' testimony during cross-examination. *See* R9-46 to 50, 72-76, 105-108. Thus, an additional instance of alleged perjury would have been of minimal significance in the jury's assessment of Williams' credibility, and certainly not enough to raise the reasonable possibility of a different verdict. *See Hays,* 85 F.3d at 1498. Therefore, because we find that the uncorrected, allegedly perjurious statements do not "undermine confidence in the verdict," *Strickler,* 527 U.S. at 290, 119 S.Ct. at 1952 (quoting *Kyles,* 514 U.S. at 435, 115 S.Ct. at 1566), we reject Dickerson's *Giglio* challenge. *Cf. Strickler*, 527 U.S. at 289-92, 119 S.Ct. at 1952-53 (finding insufficient materiality even where "[w]ithout a doubt, [witness'] testimony was prejudicial in the sense that it made petitioner's conviction more likely than if she had not testified, and discrediting [witness'] testimony might have changed the outcome of the trial").

B.    *Inconsistent Theories in Multiple Prosecutions for the Same Crime*

Dickerson's second Due Process claim rests on a comparison of the theories employed by the prosecution when charging Dickerson in the trial below and his co-conspirators in the previous trials in Georgia and South Carolina. The Government's cases in Georgia and South Carolina rested on Nelson's

---

influenced rather than, as Dickerson contends, an answer to the simple query whether he had met at all with any Government agent before the trial.

participation in *multiple* cocaine distribution conspiracies covering distinct geographic regions of the United States, including Florida. *See Nelson I.* The Government in this case indicted Nelson and Dickerson, among others, for their involvement in *one* overarching conspiracy "to distribute cocaine from South Florida throughout the eastern seaboard and midwest states of the United States," including Georgia and South Carolina. R1-30-2. Essentially, Dickerson claims that the fundamental inconsistency between the theory of the case underlying the South Carolina prosecution and the theory used to prosecute him here constitutes prosecutorial misconduct and gives rise to a violation of his Due Process rights.

Dickerson claims his prosecution falls within the line of cases raising concerns about the Due Process implications of separate prosecutions for the same crime under contradictory theories or inconsistent factual premises. *See, e.g., Jacobs v. Scott,* 513 U.S. 1067, 115 S.Ct. 711, 130 L.Ed.2d 618 (1995) (Stevens, J., dissenting from denial of cert.); *Thompson v. Calderon,* 120 F.3d 1045, 1055 (9th Cir.1997) (Fletcher, J., writing for en banc plurality), *rev'd on other grounds,* 523 U.S. 538, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998); *Drake v. Kemp,* 762 F.2d 1449, 1470 (11th Cir.1985) (Clark, J., concurring), *cert. denied,* 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986).[5] The facts of this case, however, do not support such a claim.[6]

Dickerson has failed to establish the type of inconsistency here that was present in the cases cited. The prosecution in *Jacobs, Thompson,* and *Drake* did assert a new theory or factual premise inconsistent with that presented in a previous trial for the same crime against another defendant. In those cases, however, the inconsistency in the subsequent presentation was essential in order to prosecute the individual in question. In other words, the Government in those subsequent cases could not have prosecuted the remaining individual

---

[5]Similarly, the Eighth Circuit recently held that "the use of inherently factually contradictory theories violates the principles of due process." *Smith v. Groose,* 205 F.3d 1045, 1052 (8th Cir.), *cert. denied sub nom. Gammon v. Smith,* --- U.S. ----, 121 S.Ct. 441, 148 L.Ed.2d 446 (2000).

[6]Dickerson also quotes extensively from *United States v. Kattar,* 840 F.2d 118 (1st Cir.1988), to emphasize the impropriety of the Government's inconsistent actions in this case. The portion of the opinion relied upon by Dickerson, however, addressed the Government's alleged presentation of false testimony, a separate argument raised by Dickerson *infra.* The *Kattar* court highlighted the constitutional problems that may arise when the Government introduces testimony that it knows to be false. *See* 840 F.2d at 128 (discussing *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959) and its progeny). The discrepancy between what the Government believes is true and what it knowingly presents as witness testimony, is an understood constitutional violation under *Napue.* In contrast, neither the Supreme Court nor this court has addressed the constitutional implications of inconsistent litigation positions taken by the Government against defendants being tried separately for the same crime. The *Kattar* court recognized the difference between these two issues, addressing the presentation of false testimony in one section of its opinion while dismissing the challenge to the Government's differing litigation positions in a footnote. *Compare* 840 F.2d at 127 *with* 840 F.2d at 129 n. 7.

for the same crime had the Government maintained the theory or facts argued in the earlier trial.[7] Even if, as Dickerson alleges, the Government argued a theory in the underlying prosecution that was inconsistent with that presented in the trials of Dickerson's co-conspirators, the change in the prosecution's argument was not undertaken in order to allow the Government to prosecute Dickerson. Dickerson would have been susceptible to prosecution as a conspirator whether the Government alleged the existence of multiple conspiracies, as in the trials of Dickerson's co-conspirators, or one overarching conspiracy, as in Dickerson's trial. *Cf. United States v. Paul,* 217 F.3d 989, 998 (8th Cir.2000). (rejecting Due Process claim based on inconsistent prosecutorial arguments because defendant "could have been convicted under either theory"), *reh'g en banc denied.*

Underlying *Thompson* and *Drake*—and implicit in Justice Stevens' dissent in *Jacobs*—is the concern that the Government would attempt to prosecute and convict multiple defendants for the same crime in the hopes that one of them is the true perpetrator of the crime. "The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth." *Thompson,* 120 F.3d at 1059 (quoting *Drake,* 762 F.2d at 1479). No such concerns of "mere gamesmanship" are implicated here, however, where any alleged inconsistency in the Government's conspiracy theory had no impact on the likelihood of Dickerson being convicted.

## III.    *Juror Challenge*

Dickerson next challenges the District Court's refusal to strike a juror for cause. Dickerson claims that this juror, Gabriel Fortun ("Fortun"), evinced such bias as to warrant further questioning by the District Court Judge before allowing the juror to serve.[8] The Government responds that the District Court's

---

[7]In *Jacobs* and *Drake,* the prosecution at defendant A's trial had argued that the murder was committed by A and that B did not participate in the actual killing. At defendant B's subsequent trial, the prosecution, relying on testimony provided by (now-convicted) A, insisted that B was the sole murderer. *See Jacobs,* 513 U.S. at 1068, 115 S.Ct. at 711; *Drake,* 762 F.2d at 1471-75. In *Thompson,* the prosecution in defendant A's trial claimed that A & B had been at the murder scene together, but that only A had the motive to kill the victim, and that, in fact, A did commit the murder. Following A's conviction, the prosecution argued at defendant B's trial that B had been in the victim's apartment alone, B held sufficient motive to perpetrate the crime, and B acted alone when killing the victim. *See* 120 F.3d at 1056-57.

[8]In addition, Dickerson originally argued that the District Court erred in refusing to excuse certain jurors for cause, thereby forcing Dickerson to exhaust his peremptory challenges by the time juror Fortun appeared, against whom a peremptory challenge would have been employed. Such error, according to Dickerson, constituted a violation of Due Process. *See* Dickerson Initial Br. at 27-30. At oral argument Dickerson addressed the Supreme Court's recent decision in *United States v. Martinez-Salazar,* 528 U.S. 304, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000), holding that a defendant's Due Process rights are not necessarily implicated when a District Court's improper refusal to strike a juror for cause results in an

questioning of Fortun was sufficient to demonstrate the juror's ability to render a fair decision based upon the evidence presented at trial.

The decision to strike a prospective juror for cause "upon a suggestion of partiality is within the sound discretion of the trial judge." *E.g., United States v. Rhodes,* 177 F.3d 963, 965 (11th Cir.1999) (citation omitted). The trial judge evaluating the fitness of prospective jurors must consider whether the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2891, 81 L.Ed.2d 847 (1984) (citing *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961)). In particular, when reviewing juror impartiality, this court has focused on whether (1) the juror may be affected by matters not in evidence, and (2) the juror may presume guilt rather than innocence. *See Depree v. Thomas,* 946 F.2d 784, 790 n. 11 (11th Cir.1991) (discussing *United States v. Martin,* 749 F.2d 1514 (11th Cir.1985)). Thus, we review a district court's denial of a request that a juror be stricken from a jury panel for cause to determine whether there is "fair support" in the record for district court's conclusion that the juror would be impartial. *See, e.g., Bailey v. Bd. of County Comm'rs,* 956 F.2d 1112, 1128-29 (11th Cir.), *cert. denied sub nom. Hayes v. Bailey,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 58 (1992).

The record below establishes that the District Court ensured that the challenged juror would be able to evaluate the evidence objectively and render a fair decision. The jurors in *Martin* and *Bailey* made statements that clearly reflected an inability to evaluate evidence in light of the presumption of innocence, and they openly admitted that they could not assure the court of their impartiality.[9] In contrast, Fortun's unequivocal responses to direct questions posed by defense counsel and the trial judge confirm that no further inquiry was warranted.[10] *See Rhodes,* 177 F.3d at 966 ("[A]lthough [the juror] may have had preconceived

---

exhaustion of a defendant's peremptory challenges. In light of this decision, Dickerson stated that this portion of his argument had effectively been "eliminate[d]." This court therefore does not address the relevance of *Martinez-Salazar* to Dickerson's argument related to peremptory challenges.

[9]For example, the juror in *Martin* stated the following in response to questioning by defense counsel: "If there is the slightest bit of doubt of his innocence, I would feel that—I would—I would try to weigh what was said in the courtroom, but the slightest bit of doubt, *I would say he was guilty probably.*" 749 F.2d at 1516 (emphasis added). Similarly, in *Bailey,* when asked if her personal knowledge of the defendant would affect her decision-making on the jury, the juror had responded, "I don't believe so *but I'm not quite sure.* I'm not the one to make that decision." 956 F.2d at 1128 n. 21 (emphasis added).

[10]When defense counsel initially questioned Fortun on his ability to evaluate evidence, the following exchange took place:

notions ... she demonstrated that those notions would not prevent her from deciding the case solely based on the evidence presented in court....").

IV.    *Evidentiary Rulings*

Dickerson also claims the trial judge committed reversible error in admitting the following items into evidence: (1) testimony regarding post-conspiracy drug activity; (2) hotel records reflecting Williams' stay in Philadelphia; and (3) a telephone book belonging to co-conspirator Hanks, found in Williams' car. Because Dickerson properly objected at trial to the relevant rulings, we review the District Court's evidentiary rulings for clear abuse of discretion. *See United States v. Gonzalez,* 940 F.2d 1413, 1420 & n. 13 (11th Cir.1991), *cert. denied sub nom. Garcia v. United States,* 502 U.S. 1103, 112 S.Ct. 1194, 117 L.Ed.2d 435 (1992). Factual findings underlying evidentiary rulings are reviewed for clear error. *See City of Tuscaloosa*

---

A:    I feel that you have to meet certain criteria to get a trial, and if you do that, it will be a waste of money if you don't have enough evidence on the part of the federal government.

Q:    Enough evidence for what?

A:    To convict them or enough evidence that you think you can convict them.

Q:    All right. But you are not part of the government, you are a juror in this case?

A:    Yes.

Q:    And you have to weigh the evidence?

A:    Right.

Q:    Okay. Well, the next question is: Do you think you can weigh the evidence fairly?

A:    Yes.

R8-8.

The trial judge also inquired into Fortun's friendship with a state court judge:

Q:    Your friend that's the Judge, where is that person the Judge?

A:    Alex Ferrer. [sic]

Q:    In Dade County Circuit Court?

A:    He's a friend of the family. [sic]

Q:    Is there any reason why you believe you would not sit as a juror and be fair to both sides in this case?

A:    No.

R19-86.

*v. Harcros Chems., Inc.,* 158 F.3d 548, 556 (11th Cir.1998), *cert. denied,* 528 U.S. 812, 120 S.Ct. 309, 145 L.Ed.2d 42 (1999).

*A.      Post-Conspiracy Drug Activity*

The Government sought to introduce testimony of Sears regarding Dickerson's cocaine possession and distribution in late 1993, almost two years after the last overt act in the alleged conspiracy. After reviewing the relevant standards, the trial judge found Sears' testimony relevant to proof of Dickerson's intent and plans and therefore ruled it admissible under Federal Rule of Evidence 404(b).[11]  *See* R10-10.  In addition, the judge issued limiting instructions to the jury before allowing Sears' testimony to continue. *See* R10-9 to 10.  Sears then testified that he had sold cocaine to Dickerson on numerous occasions in late 1993 and early 1994 with the intent to distribute. *See* R10-12 to 17.  The judge again issued limiting instructions to the jury at the end of the trial. *See* R3-220-11.[12]

It is well-settled in this circuit that "the principles governing what is commonly referred to as other crimes evidence are the same whether the conduct occurs before or after the offense charged, and regardless of whether the activity might give rise to criminal liability." *United States v. Delgado,* 56 F.3d 1357, 1365 (11th Cir.1995) (footnote omitted), *cert. denied,* 516 U.S. 1049, 116 S.Ct. 713, 133 L.Ed.2d 667 (1996). Those principles have been incorporated into the following three-step inquiry:

> First, the evidence must be relevant to an issue other than the defendant's character;  Second, the act must be established by sufficient proof to permit a jury finding that the defendant committed the extrinsic act;  Third, the probative value of the evidence must not be substantially outweighed by its undue prejudice, and the evidence must meet the other requirements of Rule 403.

*Delgado,* 56 F.3d at 1365 (citing *United States v. Miller,* 959 F.2d 1535, 1538 (11th Cir.) (en banc), *cert. denied,* 506 U.S. 942, 113 S.Ct. 382, 121 L.Ed.2d 292 (1992), in turn citing *Huddleston v. United States,* 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99 L.Ed.2d 771 (1988)).

To establish relevance under the first prong where testimony is offered as proof of intent, "it must

---

[11]Federal Rule of Evidence 404(b) provides as follows:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

[12]The court instructed that Sears' testimony may be considered only with respect to Dickerson's intent. *Cf.* R10-9 to 10 (judge's jury instruction during trial) *with* R3-220-11 (judge's post-trial jury instruction).  The Government also argues the relevance of Sears' testimony only to the issue of Dickerson's intent.  We therefore evaluate the propriety of the District Court's 404(b) ruling only insofar as it relates to intent, without considering whether the evidence could have been admitted to show a plan.

be 'determined that the extrinsic offense requires the same intent as the charged offense....' " *United States v. Cardenas,* 895 F.2d 1338, 1343 (11th Cir.1990) (quoting *United States v. Barnes,* 586 F.2d 1052, 1057 (5th Cir.1978), in turn quoting *United States v. Beechum,* 582 F.2d 898, 913 (5th Cir.1978), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979)). The charge in this case is conspiracy to possess with intent to distribute cocaine, *see* R1-30-2; the subsequent extrinsic act revealed by Sears' testimony was the purchase and possession of large quantities of cocaine. *See* R10-12 to 17. The charged act and the challenged similar act involve the same mental state. *See United States v. Green,* 40 F.3d 1167, 1174 (11th Cir.1994) (finding prior arrest for possession of distributable amount of cocaine relevant to establish intent for charge of conspiracy to possess with intent to distribute cocaine), *cert. denied,* 514 U.S. 1089, 115 S.Ct. 1809, 131 L.Ed.2d 733 (1995). The Government therefore permissibly relied on the subsequent act to prove intent of the charged crime.

With respect to the second prong, "the uncorroborated word of an accomplice ... provides a sufficient basis for concluding that the defendant committed extrinsic acts admissible under Rule 404(b)." *United States v. Bowe,* 221 F.3d 1183, 1192 (11th Cir.2000) (citing *United States v. Trevino,* 565 F.2d 1317, 1319 (5th Cir.1978)). Here, Sears, the supplier of Dickerson's subsequent cocaine purchases, provided sufficient proof of the extrinsic act through his testimony to support a jury's conclusion that Dickerson did purchase and possess cocaine after the charged conspiracy ended.

Third, the probative value of Sears' testimony substantially outweighs its possible prejudicial effect. *See United States v. Diaz-Lizaraza,* 981 F.2d 1216, 1225 (11th Cir.1993) (identifying criteria for weighing probative value against prejudicial effect). The charged crime and the extrinsic act are extremely similar, as both offenses required proof of certain common elements, and each offense furthered the overall purpose of trafficking in cocaine. *See United States v. Zapata,* 139 F.3d 1355, 1358 (11th Cir.1998); *Delgado,* 56 F.3d at 1366. Furthermore, the two-year time period between the last overt act of the alleged conspiracy and the cocaine transactions identified in Sears' testimony is not so remote as to undercut the probative value of the subsequent acts in establishing Dickerson's intent. *See Diaz-Lizaraza,* 981 F.2d at 1225. Finally, the Government's remaining evidence of Dickerson's intent rested on the testimony of other co-conspirators. The Government therefore needed to rely upon the Sears testimony to bolster its case regarding Dickerson's intent. *See Martinez,* 127 F.3d at 1332 (finding extrinsic act probative where co-conspirator testimony was Government's sole evidence of defendant's intent); *Cardenas,* 895 F.2d at 1343-44 (same).

Sears' testimony regarding Dickerson's post-conspiracy drug transactions was thus relevant and highly probative of Dickerson's intent. The District Court did not abuse its discretion in admitting the testimony.

B.    *Hotel Records*

 The Government sought to introduce Williams' hotel records to establish the dates of Williams' stay in Philadelphia. *See* R8-182 to 184. Because the Government introduced the records to "prove the truth of the matter asserted," Dickerson objected to these records as inadmissible hearsay. *See* Fed.R.Evid. 801(c). In response, the Government cited Federal Rule of Evidence 803(6), the business records exception to the hearsay rule. After reviewing the document, the District Court overruled the objection.

The plain language of Rule 803(6) permits the introduction of business records that would otherwise be inadmissible as hearsay evidence provided that "the testimony of the custodian or other qualified witness" verifies the record-keeping procedure of the document in question and confirms that such document is created as part of normal business practice. Fed.R.Evid. 803(6). In this case, however, the Government presented no "custodian or qualified witness" to authenticate the records as required by the rule. *Id.* Thus, the District Court abused its discretion in admitting the hotel records without any basis for determining their reliability. *See United States v. Williams,* 837 F.2d 1009, 1013 n. 6 (11th Cir.), *cert. denied,* 488 U.S. 965, 109 S.Ct. 490, 102 L.Ed.2d 527 (1988).

 The trial court's evidentiary ruling, however, "will result in reversal only if the resulting error was not harmless." *United States v. Hands,* 184 F.3d 1322, 1329 (11th Cir.1999) (citing *United States v. Church,* 955 F.2d 688, 700 (11th Cir.), *cert. denied,* 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992), and Fed.R.Crim.P. 52(a)). We find an error harmless where "the purported error had no substantial influence on the outcome and sufficient evidence uninfected by error supports the verdict." *United States v. Fortenberry,* 971 F.2d 717, 722 (11th Cir.1992) (citation omitted), *cert. denied,* 506 U.S. 1068, 113 S.Ct. 1020, 122 L.Ed.2d 166 (1993).

Even discounting the credibility of Williams' testimony, we find sufficient evidence in the record to support the jury's conclusion that Dickerson was nevertheless involved in the charged conspiracy. *Cf. Hands,* 184 F.3d at 1330-31 n. 23 ("Harmless error review, unlike a determination of the sufficiency of the evidence, does not require us to view witnesses' credibility in the light most favorable to the government.") (citations omitted). The testimony of Sears and Kirkland sufficiently linked Dickerson with other co-conspirators, *see*

R10-202; R10-16, 22 to 23; R10-207; R10-192 to 193,[13] and supported Dickerson's intent to participate in the conspiracy and his actual participation therein. *See, e.g.,* R10-12 to 17 (Sears testimony); R10-188 to 192, 194, 198, 199, 202 (Kirkland testimony). Furthermore, as discussed *infra,* Dickerson was also connected to his co-conspirators by his phone number written into one co-conspirator's personal phone book, found in yet another co-conspirator's car. In light of this remaining evidence, therefore, we cannot conclude that the District Court's error in admitting the hotel records had a "substantial influence on the outcome" of Dickerson's trial.

*C.      Hanks' Telephone Book*

Dickerson's final evidentiary objection relates to a telephone book discovered by police in Williams' car when Williams was arrested. Williams testified that the telephone book had belonged to Hanks. *See* R9-15 to 16. The telephone book contained the name "Frank" inscribed next to various telephone numbers. *See* R12-96 to 98. Over Dickerson's objection that the phone book lacked sufficient authentication, the District Court admitted the book under Federal Rule of Evidence 801(d)(2)(E)[14] as the statement of a co-conspirator.[15] *See* R11-97-98, 102, 107.

When seeking to offer a co-conspirator's statement into evidence under Rule 801(d)(2)(E), the Government must first establish the following by a preponderance of the evidence: (1) that a conspiracy existed; (2) that the conspiracy included the declarant and the defendant against whom the statement is offered; and (3) that the statement to be introduced was made during the course and in furtherance of the conspiracy. *See Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987);

---

[13]In particular, the testimony of Sears and Kirkland connected Dickerson to the other conspirators through Dickerson's presence, with other co-conspirators, at Hanks' funeral, *see* R10-202 to 203 (Kirkland testimony); his possession of one of the vehicles known to carry cocaine among the distribution locations, *see* R10-16, 22 to 23 (Sears testimony), R10-207 (Kirkland testimony); and his joint financial interest with other co-conspirators in the Miami house in which certain drug transactions took place, *see* R10-192 to 193 (Kirkland testimony).

[14]Federal Rule of Evidence 801(d)(2)(E) provides as follows:

A statement is not hearsay if—

(2) Admission by party opponent. The statement is offered against a party and is ... (E) a statement made by a coconspirator of a party during the course and in furtherance of the conspiracy....

[15]The Government also argued at trial that Federal Rule of Evidence 803(24), the catch-all provision, provided an alternative basis for admission of the telephone book. R11-102. Because we find the requirements of Rule 801(d)(2)(E) satisfied, we do not address this alternative argument.

*United States v. Van Hemelryck,* 945 F.2d 1493, 1497-98 (11th Cir.1991).[16] When determining whether the above elements have been satisfied, the District Court may rely on information provided by the co-conspirator's proffered statement as well as independent external evidence. *See Bourjaily,* 483 U.S. at 180-81, 107 S.Ct. at 2781; *United States v. Byrom,* 910 F.2d 725, 735-36 (11th Cir.1990).

As an initial matter, we reject Dickerson's contention that the District Court failed to make the above findings before admitting the telephone book into evidence. After hearing Williams' testimony that the book had belonged to Hanks, and Agent McLeod's testimony that he had made photocopies of the telephone book found in Williams' car, the trial judge concluded that the writings belonged to Hanks. *See* R11-101, 104. The judge also concluded that the individuals in question were linked to Hanks through their participation in the same conspiracy and that the address book was being used during the time period encompassed by this conspiracy. *See* R11-102. Admittedly, the judge did not expressly state that he was making the requisite factual findings under Rule 801(d)(2)(E) when arriving at his conclusions regarding the authentication of the telephone book. Nevertheless, the transcript reveals sufficient decision-making for us to base our review on the District Court's findings.[17]

We agree that the prerequisites of Rule 801(d)(2)(E) have been satisfied here. Williams' testimony that the phone book belonged to Hanks was sufficient circumstantial evidence from which the trial court could have concluded authorship of the entries by Hanks. *See United States v. Dynalectric Co.,* 859 F.2d 1559, 1581-82 (11th Cir.1988), *cert. denied,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). The testimony of Sears, Kirkland, and Williams also sufficiently establish that Dickerson and Hanks were part of the same conspiracy and, therefore, that the "Frank" noted in the book likely referred to Dickerson. *See* R9-9 to 11 (Williams); R10-12 to 17 (Sears); R10-188 to 202 (Kirkland). As recognized by the trial judge, Hanks' entries were made "during the course" of the conspiracy, because the fact that Hanks continued to carry the book (as attested to by Williams, *see* R9-15) revealed that "it was being used as [the conspirators'] address book during the time period encompassed by this conspiracy." R11-102.

Finally, we apply "a liberal standard in determining whether a statement is made in furtherance of

---

[16]Dickerson does not challenge the first element of the *Bourjaily* standard, which requires that the Government establish the existence of a conspiracy.

[17]Dickerson argues that *United States v. West,* 142 F.3d 1408 (11th Cir.1998), *vacated on other grounds,* 526 U.S. 1155, 119 S.Ct. 2042, 144 L.Ed.2d 211 (1999), mandates reversal. Because we determine that the District Court, unlike the trial court in *West,* did make the factual findings required under Rule 801(d)(2)(E), we reject Dickerson's argument.

a conspiracy." *United States v. Santiago,* 837 F.2d 1545, 1549 (11th Cir.1988) (citation omitted).  Relying on the ongoing use of the telephone book, the District Court apparently concluded that any time Hanks relied on the phone numbers of co-conspirators inscribed in the book, the objectives of the conspiracy would have been furthered by facilitating communication among co-conspirators to engage in the unlawful ends of the conspiracy, for example, the scheduling of cocaine deliveries.  When viewed in the context of the remaining testimony, therefore, the factual prerequisites for Rule 801(d)(2)(E) have been satisfied, and the District Court did not abuse its discretion in admitting the phone book into evidence.

V.     *Allen* Charge

Finally, Dickerson challenges the District Court's issuance of a modified *Allen* charge, based on this circuit's pattern instructions,[18] claiming that the charge coerced the jury into returning a guilty verdict. Because the District Judge did not poll the jurors before reading the *Allen* charge, "we can reverse their verdict only if we find that the giving of the *Allen* charge was inherently coercive." *United States v. Trujillo,* 146 F.3d 838, 846 (11th Cir.1998).

We previously have upheld the language employed in the *Allen* charge given here, *see Trujillo,* 146 F.3d at 846-47, even when used in conjunction with a polling of jurors. *See United States v. Chigbo,* 38 F.3d 543, 545-46 (11th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995).  Dickerson specifically challenges the reference to the costs of a trial, the impact of the charge upon jurors in the minority, and the timing of the jury's decision after hearing the *Allen* charge.  In *United States v. Rey,* 811 F.2d 1453, 1458-60 (11th Cir.), *cert. denied,* 484 U.S. 830, 108 S.Ct. 103, 98 L.Ed.2d 63 (1987), we acknowledged the potential for coercion in the pattern instructions, *see id.,* the language of which has not changed in the intervening years.  *Compare id.* at 1461 (Appendix) *with* Pattern *Allen* Instruction. Nevertheless, we upheld the charge in *Rey* in light of binding precedent expressly upholding a similarly-worded *Allen* charge and under arguably more severe circumstances.  *See* 811 F.2d at 1460 (citing *United States v. Alonso,* 740 F.2d 862, 876-78 (11th Cir.1984), *cert. denied,* 469 U.S. 1166, 105 S.Ct. 928, 83 L.Ed.2d 939 (1985) (similarly-worded *Allen* charge upheld);  and *Andrews v. United States,* 309 F.2d 127, 129 (5th Cir.1962), *cert. denied,* 372 U.S. 946, 83 S.Ct. 939, 9 L.Ed.2d 970 (1963) (no coercion when jury returned verdict 25 minutes after hearing *Allen* charge)).  Likewise, given our more recent precedent, *see, e.g.,*

---

[18]*See* U.S. Eleventh Circuit District Judges Ass'n, Pattern Jury Instructions (Criminal Cases), Trial Instructions n.6 (West 1997) [hereinafter "Pattern *Allen* Instruction"].

*Trujillo,* 146 F.3d at 846-47; *Chigbo,* 38 F.3d at 546; *United States v. West,* 898 F.2d 1493, 1500-01 & n. 3 (11th Cir.1990), *cert. denied,* 498 U.S. 1030, 111 S.Ct. 685, 112 L.Ed.2d 676 (1991), and in the absence of further evidence of coercion, we affirm the verdict below.

*VI.      Conclusion*[19]

We hold that the District Court (1) properly refused to dismiss the superseding indictment, (2) did not issue an unduly coercive *Allen* charge in its jury instruction; and (3) did not abuse its discretion in denying Dickerson's motion for a new trial based on Williams' allegedly perjured testimony; refusing to strike a challenged juror for cause; and admitting into evidence testimony regarding post-conspiracy offenses and a co-conspirator's telephone book. The District Court's error in admitting Williams' hotel records into evidence under Federal Rule of Evidence 803(6) was harmless. For the foregoing reasons, the judgment of the District Court is

AFFIRMED.

\*   \*   \*

\*   \*   \*

---

[19]Dickerson also argues that the Government presented insufficient evidence to support the charge, in particular, that the evidence proffered at trial fails to establish the existence of one single conspiracy in this case as opposed to multiple conspiracies. Reviewing the evidence in the light most favorable to the Government, and drawing all inferences and determinations of witness credibility in favor the jury's verdict, *see United States v. Glinton,* 154 F.3d 1245, 1258 (11th Cir.1998), *cert. denied sub nom. Davis v. United States,* 526 U.S. 1104, 119 S.Ct. 1587, 143 L.Ed.2d 681 (1999), we find this claim meritless.