[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DEC 15, 2008
THOMAS K. KAHN
CLERK

_____

No. 08-13237
Non-Argument Calendar

_____

D. C. Docket No. 01-00203-CR-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE B. JOHNSON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Alabama

_____

**(December 15, 2008)**

Before TJOFLAT, DUBINA and FAY, Circuit Judges.

PER CURIAM:

Willie B. Johnson appeals his convictions and 260-month total sentence, imposed following his conviction on 1 count of conspiracy to possess with intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. § 846, and 3 counts of possession with intent to distribute cocaine and crack cocaine, in violation of 21 U.S.C. § 841(a)(1). On appeal, Johnson first argues that the district court erred by denying his motion for a new trial based on newly discovered evidence without conducting an evidentiary hearing because such a hearing would have impacted the credibility of prosecution witnesses' testimony as to the amount of drugs for which he was responsible. Next, Johnson argues that he was sentenced under an unconstitutional mandatory guidelines system and that his sentence was greater than necessary to achieve the statutory purposes of sentencing. He argues that the district court failed to consider mitigating factors that militated in favor of a below-guideline sentence, including testimony regarding the amount of drugs and alleged collusion of prosecution witnesses, as well as evidence of his background and his role in the community, and he argues that the court "utilized an improper and unproved sentencing enhancement" that resulted in an unconstitutional sentence. For the reasons set forth below, we affirm.

**I.**

In a superseding indictment, a federal grand jury charged Johnson with conspiracy to possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of crack cocaine from 1991 to July 3, 2001 ("Count 1"); possession with intent to distribute more than 100 grams of cocaine on or about August 2, 1998 ("Count 2"); possession with intent to distribute approximately 9 ounces of cocaine in June 1999 ("Count 3"); and possession with intent to distribute approximately 9 ounces of crack cocaine in the summer of 2000 ("Count 4").

According to the presentence investigation report ("PSI"), in the course of investigating Frankie Miller, a drug dealer in Mobile, Alabama, law enforcement received incriminating information regarding Johnson, a lifelong friend and associate of Miller's. At trial, the government called several of Johnson's drug associates, who testified as to their dealings with Johnson. Both parties began by stipulating that Regina Chambers ("Regina") was arrested on October 4, 1991, and found to have 987.7 grams of crack cocaine in her vehicle. According to the stipulation, Regina would testify that she was going to Mobile, Alabama to deliver the car containing the crack cocaine to Orlando Kemp. The following witnesses testified as follows.

Kemp testified that, in October 1991, he received a "large amount" of cash from Johnson. He was going to give the cash to Regina, who was his cousin, to

3

deliver to Mobile. Kemp was to receive $1,000 for delivering the money to Regina.

Terrance Chambers ("Chambers") testified that he previously had been convicted of drug charges and had entered into an agreement to cooperate with the United States in exchange for a sentence reduction. He knew Johnson and Miller growing up. In October 1991, he agreed to send a kilogram of crack cocaine to Johnson. He asked Regina to take the package to Kemp for Johnson, and Johnson was to pay $25,000 for the kilogram of crack cocaine. Once Johnson gave the money to Kemp, Chambers put the crack cocaine in the trunk of Regina's rental vehicle and sent her down to Mobile. Regina was stopped for speeding and arrested, and the crack cocaine was seized. He also testified that, at a Mardi Gras parade in 1995 or 1996, he saw Johnson give Miller a "handful of money." On cross-examination, Chambers testified that, after the one deal, he never had other dealings with Johnson.

Dewit Germaine Harold Lambert III, who went by the name "Fred," testified that he had been in custody since 1999 for drug crimes, and he currently had a Rule 35 motion pending to get a sentence reduction for cooperating with the government. He knew Chambers and Johnson, and Miller was his uncle. In the early 1990's, he learned that Miller was dealing drugs out of Atlanta, and he began to get crack cocaine for Miller. Sometimes, he would buy drugs from Johnson and

4

sell those drugs before paying Miller, and he had purchased four-and-one-half ounces of powder cocaine and crack cocaine, a "big 8," from Johnson. He twice saw Miller give Johnson powder cocaine, hand to hand. On cross-examination, Lambert testified that he had written and signed a letter admitting that he testified falsely or provided false statements against two other individuals in a different proceeding.

Arthur Patterson testified that, prior to 1995, he was paid to traffic cocaine from Atlanta to Mobile. Miller supplied him with approximately 12 to 14 kilograms of cocaine and crack cocaine from 1992 to 1995. He saw Johnson with Miller in 1992, and he saw Johnson take nine ounces of powder cocaine from Miller.

Brannon Leverette testified that he began to sell drugs in 1993, and he got the drugs from Johnson. He estimated that, between 1993 and 2001, he received approximately 120 or 130 ounces of cocaine and about 2 or 3 ounces of crack cocaine from Johnson.

Lashawn Moran testified that, in the summer of 2000, he received nine ounces of cocaine from Johnson, four of which he bought and five of which Johnson fronted to him.

5

Antalon Stevenson testified that, from 1990 to 1999, he purchased approximately half a kilogram of powder cocaine and about a kilogram of crack cocaine from Johnson.

Brent Lewis testified that, on one occasion, he purchased a quarter of an ounce of powder cocaine from Johnson for $275. He also testified that, in June 1999, he purchased 9 ounces of powder cocaine from Johnson for $5,500.

Avery Mills testified that he bought crack cocaine from Johnson about 20 or 25 times from 1993 or 1994 to 1998. He estimated that, from 1993 or 1994 to 1998, he received over 100 ounces of crack cocaine from Johnson.

Zackary Felippi Watkins testified that he bought a "couple of ounces" of crack from Johnson in 1994. He also bought cocaine from Johnson for a couple of years beginning in 1998, from one ounce to a kilogram. On cross-examination, he testified that he bought a kilogram of powder cocaine on more than one occasion and bought crack cocaine a couple of times.

Amos Daniels testified that, on 1 occasion, he purchased 3 ounces of crack cocaine from Johnson for $850 per ounce. On another occasion, he bought 5 ounces of crack cocaine from Johnson for $800 an ounce.

Robert Oakley, testified that he had known Johnson since 1993 or 1994, and he had purchased about an ounce of powder cocaine per week from Johnson up

6

until 1996. He estimated that he bought an ounce per week of powder cocaine from 1993 to 1996.

Nathaniel Agee testified that he met Johnson in the middle of 2000 to purchase nine ounces of crack cocaine. He purchased 9 ounces of crack cocaine for $7,500 from Johnson on 4 or 5 different occasions.

The defense called various witnesses to testify on Johnson's behalf. At the end of the trial, the jury found Johnson guilty as charged, and specifically found that, as to Count 1, the object of the conspiracy was over 5 kilograms of cocaine and over 50 grams of crack cocaine. As to the remaining counts, the jury found that the amount of crack cocaine Johnson possessed with the intent to distribute was 50 grams or more.

A probation officer prepared the PSI and, after grouping the counts together pursuant to U.S.S.G. § 3D1.2(d), determined that Johnson's base offense level was 38, pursuant to U.S.S.G. § 2D1.1(c)(1), because he was responsible for 1,500 grams of crack cocaine and 5,000 grams of powder cocaine. Johnson received a 3-level increase for being a manager or supervisor, pursuant to U.S.S.G. § 3B1.1(b), which yielded a total offense level of 41. Johnson had zero criminal history points, which placed him in a criminal history category of I. Based on his total offense level of 41 and his criminal history category of I, Johnson's guideline range was 324 to 405 months' imprisonment. Johnson objected to his base offense

level calculation, arguing that the evidence did not support the quantity of drugs for which he was held accountable. Johnson also objected to the enhancement for being a manager or supervisor in the criminal organization.

In September 2002, Johnson filed a "Motion For Dismissal/New Trial," arguing that a letter from an inmate that the government had faxed to Johnson's counsel on August 6, 2002, constituted newly discovered evidence warranting a dismissal of all charges against him or, in the alternative, a new trial. Johnson also requested an evidentiary hearing. Johnson filed a brief in support of his motion, arguing that the inmate's letter satisfied the four criteria to warrant a new trial.

Johnson attached the alleged newly discovered evidence, which was a handwritten letter from James Musta, an inmate housed at the Baldwin County Jail since April 12, 2002. In the letter, Musta set out the following. An incident occurred where "Art Patterson, Terrance Chambers (Suge), and Craig Mimms" entered his cell and began talking about a previous court case in which they had testified. The individuals "decided to get together and testify in another case," and they began talking about "a guy in Mobile" named Willie Johnson. "They coached each other on the story about" Johnson. Only "Suge" and a friend of his named "Fred" seemed to "really know the guy," and they would pass notes under the door and talk through the door daily. "They would sit around and discuss what to say to the Feds in order to get time cuts." It seemed that Art Patterson knew "nothing"

8

about the case and had to be "schooled by Suge and Fred." The talks occurred in Musta's cell on a daily basis. The letter continued, "Chambers and Fred would tell what they heard on the case against Willie Johnson to Art Patterson and the others. Then they would all get together to get their stories straight and then call the Feds on the phone or Art would write them or the courts."

The district court denied Johnson's motion for dismissal or motion for a new trial. The court concluded that any evidence in Musta's letter was merely impeaching evidence and that, even if the witnesses were coaching each other, the allegation went to the weight and credibility of their testimony. Because the evidence was merely impeaching, the court concluded that a new trial was unnecessary.

At sentencing in December 2002, counsel for Johnson indicated that he could not produce Musta because Musta was incarcerated and they could not come up with the deposit to have him testify. Counsel indicated that Musta's live testimony would have impacted the credibility and reliability of Chambers's, Lambert's, and Patterson's trial testimony, particularly as it related to the amount of drugs. The court found that Musta's letter was not admissible for sentencing purposes. As to the enhancement for being a manager or supervisor, the court granted Johnson's objection and denied the enhancement.

The court then set out that Johnson's total offense level was 38 and his criminal history category was I, which resulted in a guideline range of 235 to 293 months' imprisonment. The court provided that a mid-range sentence was appropriate, as it was a substantial amount of imprisonment. The court sentenced Johnson to 260 months' imprisonment as to Counts 1 and 4, and 240 months' imprisonment as to Counts 2 and 3, all to run concurrent. The court stated, "I have imposed this sentence at the mid-range, because I believe, based on all the evidence, the facts and circumstances, that sentence meets the sentencing objective of punishment, deterrence and incapacitation." The court asked if either party had any additional objections to its findings, its conclusions, or the manner in which the sentence was imposed, and neither party offered any new objections.

Johnson filed a timely notice of appeal, but we dismissed his appeal because he failed to file a brief and record excerpts in a timely fashion. Johnson then filed a motion to vacate, set aside, or correct his sentence, pursuant to 28 U.S.C. § 2255, arguing, inter alia, that his counsel had been ineffective during the appellate review phase of his case. In 2008, the district court granted his § 2255 motion, finding that his counsel had been ineffective for failing to prosecute the appeal. The court vacated the original judgment and imposed a sentence identical to the original sentence to enable him to file a new notice of appeal, in accordance with the

procedures set out in United States v. Phillips, 225 F.3d 1198 (11th Cir. 2000).

Johnson now appeals.

## II.

## A. Denial of Motion for a New Trial without an Evidentiary Hearing

We review a district court's denial of a motion for a new trial based on newly discovered evidence for an abuse of discretion. United States v. Vallejo, 297 F.3d 1154, 1163 (11th Cir. 2002). Likewise, we review a district court's decision concerning whether to hold an evidentiary hearing for an abuse of discretion. United States v. Massey, 89 F.3d 1433, 1443 (11th Cir. 1996).

Federal Rule of Criminal Procedure 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R.Crim.P. 33(a).

> To succeed on a motion for new trial based on newly discovered evidence, the movant must establish that (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir. 2003) (quotation omitted). "Failure to meet any one of these elements will defeat a motion for a new trial." United States v. Starrett, 55 F.3d 1525, 1554 (11th Cir. 1995).

11

"Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial." United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc) (quotation omitted). "Newly discovered impeaching evidence is insufficient to warrant a new trial." United States v. Champion, 813 F.2d 1154, 1171 (11th Cir. 1987).

A defendant is not entitled to an evidentiary hearing on a motion for a new trial if "the acumen gained by a trial judge over the course of the proceedings [made him] well qualified to rule on the [evidence] without a hearing." United States v. Schlei, 122 F.3d 944, 994 (11th Cir. 1997) (quotation omitted). A motion for a new trial "may ordinarily be decided upon affidavits without an evidentiary hearing," and "[w]here evidentiary hearings are ordered, it is because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession." United States v. Hamilton, 559 F.2d 1370, 1373 (5th Cir. 1977).

Here, the district court denied Johnson's motion for a new trial based on its conclusion that any evidence in the Musta letter was merely impeaching and that the allegation that witnesses coached each other went to the weight and credibility of their testimony. The Musta letter lists Patterson, Chambers, Craig Mimms, and "Fred." As an initial matter, no one named Craig Mimms testified at Johnson's

12

trial, and the only person who went by the name "Fred" was Lambert. The Musta letter provides that these individuals "coached" each other and that Patterson knew "nothing" about the case and had to be "schooled" by Chambers and Fred. As a suggestion that these witnesses did not offer truthful testimony at trial, the letter goes to their credibility and could only be used on cross-examination for impeachment purposes. Therefore, the district court correctly concluded that the evidence was merely impeaching and did not warrant a new trial. See Jernigan, 341 F.3d at 1287 (requiring a movant to establish that the newly discovered evidence is not merely impeaching); United States v. Diaz, 190 F.3d 1247, 1255 (11th Cir. 1999) (holding that the newly discovered evidence – a sworn statement by a co-conspirator that contradicted his testimony at trial – was relevant solely for impeaching his credibility and would not probably produce an acquittal); United States v. Noriega, 117 F.3d 1206, 1221-22 (11th Cir. 1997) (holding that the district court did not abuse its discretion in denying a motion for a new trial because "[e]vidence regarding the bribing of a witness, although disturbing, clearly does constitute impeachment material").

Furthermore, Johnson cannot show that the evidence would likely have produced a different result at trial because, even discrediting the testimony of Chambers, Patterson, and Lambert, the government presented ample evidence to support the jury verdict. With respect to Count 1, the testimony established that

13

Johnson conspired to possess more than 5 kilograms of powder cocaine, as Leverette testified that he received approximately 120 ounces (over 3 kilograms) of powder cocaine from Johnson; Watkins testified that he received at least 1 kilogram of cocaine from Johnson; and Oakley testified that he received an ounce of powder cocaine a week for 3 years from Johnson. Even taking only these three witnesses, the amount of over five kilograms of cocaine is established. The testimony also amply supports that Johnson possessed 50 grams of crack cocaine, as Leverette's testimony alone that he received 2 ounces (over 50 grams) of crack cocaine, supports the finding. As to Count 2, Leverette testified that, in early August 1998, he was arrested in possession of 4 ounces (over 100 grams) of powder cocaine which he had gotten from Johnson, which the jury could find established that Johnson was in possession of over 100 grams of powder cocaine in early August 1998. As to Count 3, Lewis testified that, in June 1999, he purchased nine ounces of powder cocaine from Johnson. As to Count 4, Agee testified that he met Johnson in the middle of 2000 to purchase nine ounces of crack cocaine from him. Because the jury verdict was supported by the evidence at trial, even discounting the testimony of the individuals named in the Musta letter, Johnson cannot show that the letter would probably have produced a different outcome at trial. See Jernigan, 341 F.3d at 1287; Starrett, 55 F.3d at 1554 (holding that an affidavit by a former cellmate of a government witness, which stated that the

14

witness intended to perjure himself, would not have produced a different outcome at trial because there was ample evidence apart from the witness's testimony to support the convictions).

Because Johnson fails at least two of the five requirements to warrant a new trial based on newly discovered evidence, and the failure to meet any one requirement is fatal to a motion for a new trial, the district court did not abuse its discretion by denying his motion for a new trial. See Starrett, 55 F.3d at 1554. Furthermore, because the court did not abuse its discretion in denying Johnson's motion for a new trial on its merits, the court also did not abuse its discretion in refusing to hold an evidentiary hearing on the motion. See United States v. Slocum, 708 F.2d 587, 600 (11th Cir. 1983) (holding that, because we agreed with the decision to deny a motion for a new trial on the merits, the district court did not abuse its discretion in denying the motion without an evidentiary hearing).

Our decision in United States v. Espinosa-Hernandez, 918 F.2d 911 (11th Cir. 1990), does not change this outcome. In Espinosa-Hernandez, we reversed a district court's denial of Jairo Espinosa-Hernandez's ("Espinosa") motion for a new trial based on newly discovered evidence when the court did not hold an evidentiary hearing. Id. at 912, 914. In that case, a Customs Service Agent, David Urso ("Urso"), was the case agent in charge of the sting operation that led to Espinosa being indicted. Id. at 912. Urso was the only witness to testify before the

15

grand jury, and it was undisputed that he had made false statements to the grand jury and in his affidavit for the criminal complaint. Id. at 913. At trial, Espinosa argued that the testimony of a confidential informant ("CI") was essential to his defense. Id. The CI was under Urso's supervision, and based on Urso's representation at trial, the court found that the CI was unable to testify. Id. After Espinosa's conviction, he learned that Urso had been indicted for allegedly making false statements on his federal job application, and Espinosa alleged that Urso was under investigation for his participation in a different CI's escape from federal custody. Id. The district court denied Espinosa's motion for a new trial, concluding that the newly discovered evidence would be purely impeaching and that it would not likely lead to a different result at trial. Id.

As to the finding that the evidence was merely impeaching, we concluded that discovery or an evidentiary hearing could reveal that Urso committed perjury in Espinosa's trial or a related proceeding. Id. at 913-14. We pointed out that Espinosa alleged that Urso was under investigation for helping a CI under his supervision to escape from federal custody, and that Espinosa claimed that Urso willfully secured the unavailability of the CI in his case. Id. at 914. We concluded that, if it was discovered that Urso committed perjury in a proceeding similar to Espinosa's trial, the new evidence would go beyond mere impeachment evidence and a new trial would be necessary to "remove the taint" from Espinosa's

16

conviction.  Id.  We also noted that discovery would reveal when the U.S. Attorney's office learned of the allegations against Urso, which could warrant a new trial based on the government's failure to disclose evidence that could have been used to impeach a witness.  Id.

With respect to the impact the evidence would have had at trial, we concluded that Urso's testimony might have tarnished Espinosa's credibility and influenced the jury to believe the "hotly contested" testimony of three other witnesses, instead of Espinosa's claims of innocence.  Id.  We also noted that, from a procedural standpoint, Urso had a "tremendous impact" on Espinosa's conviction because Urso alone was responsible for persuading the grand jury of the existence of a single conspiracy and that discovery might lead to evidence that Urso's misstatements to the grand jury and in the criminal complaint affidavit were made in bad faith.  Id.  In addition, we reasoned that discovery could reveal that Urso deliberately secured the unavailability of the CI.  Id.  Therefore, we reversed the district court's denial of Espinosa's motion for a new trial because "[t]he new evidence might easily extend beyond that of mere impeachment and it might be likely to lead to Espinosa's acquittal in a second trial."  Id.

Johnson's case is distinguishable from Espinosa-Hernandez because, in this case, there is no accusation that the witnesses identified in Musta's letter procured the absence of a witness crucial to Johnson's defense, which, in

17

Espinosa-Hernandez, we concluded could elevate the evidence above mere impeachment evidence. Id. In addition, there is no indication here that the government knew that the witnesses would provide untruthful testimony prior to trial, unlike in Espinosa-Hernandez, where the U.S. Attorney's office knew of Urso's misstatements and could have known about them before trial. Id. Musta's letter contains nothing that might similarly elevate its contents to anything above mere impeachment evidence, and it in no way alleges the government was aware of the alleged coaching.

Furthermore, in Espinosa-Hernandez, we determined that Urso's testimony could have persuaded the jury to believe the "hotly contested" testimony of three witnesses instead of Espinosa's testimony. 918 F.2d at 914. In this case, there were nine other witnesses who testified about their drug dealings with Johnson. See Starrett, 55 F.3d at 1554. In addition, with respect to Chambers and Lambert, trial testimony established that they both hoped to receive sentence reductions for cooperating with the government, and Lambert admitted testifying falsely in a different proceeding. Accordingly, it cannot be said that evidence that these witnesses coached each other would have greatly affected the jury, especially given the consistent testimony given by numerous other witnesses. In addition, there is no indication that the witnesses identified in Musta's letter had as significant of an impact on Johnson's conviction as in Espinosa-Hernandez, where Urso may have

18

made misstatements to the grand jury in bad faith and may have deliberately secured the unavailability of a witness Espinosa claimed was essential to his defense. 918 F.2d at 914. Accordingly Espinosa-Hernandez does not control the outcome of this case, and based on the analysis above, we affirm as to this issue.

**B.** **Sentencing under mandatory Guidelines**

As an initial matter, Johnson originally was sentenced in 2002, before the Supreme Court's decision in United States v. Booker, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). Johnson did not raise a constitutional objection to his sentence at that time. After we dismissed his appeal for want of prosecution, he filed a § 2255 motion, alleging ineffective assistance of counsel, and the district court granted the motion and reimposed an identical sentence to enable to Johnson to file an out-of-time appeal, pursuant to the procedures set out in Phillips.[1] Although the amended judgment was entered in 2008, we review the original sentencing hearing in these circumstances. See United States v. Phillips, 287 F.3d

---

[1] In Phillips, we held,

> When the district courts of this circuit conclude that an out-of-time appeal in a criminal case is warranted as the remedy in a § 2255 proceeding, they should effect that remedy in the following way: (1) the criminal judgment from which the out-of-time appeal is to be permitted should be vacated; (2) the same sentence should then be reimposed; (3) upon reimposition of that sentence, the defendant should be advised of all the rights associated with an appeal from any criminal sentence; and (4) the defendant should also be advised that the time for filing a notice of appeal from that re-imposed sentence is ten days, which is dictated by Rule 4(b)(1)(A)(i).

225 F.3d at 1201.

1053, 1056-58 (11th Cir. 2002) (reviewing the court's findings from the original sentencing hearing after the district court reimposed the same sentence pursuant to Phillips). Because Johnson did not raise a constitutional challenge to his sentence before the district court, we review his Booker argument for plain error. See United States v. Shelton, 400 F.3d 1325, 1328 (11th Cir. 2005) (reviewing Booker issues not raised in the district court for plain error).

Under plain-error review, we "may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." Id. at 1328-29 (quotation omitted). If these criteria are met, a court of appeals has the discretion to correct the error, but "should" correct the error only if it "seriously affects the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 507 U.S. 725, 736, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993) (quotation and alteration omitted). In applying the third prong of the plain-error test, we ask "whether there is a reasonable probability of a different result if the guidelines had been applied in an advisory instead of binding fashion by the sentencing judge." United States v. Rodriguez, 398 F.3d 1291, 1301 (11th Cir. 2005). "Where errors could have cut either way and uncertainty exists, the burden is the decisive factor in the third prong of the plain error test, and the burden is on the defendant." Id. at 1300. The third prong of

20

plain error review is "exceedingly difficult for defendants to overcome." Shelton, 400 F.3d at 1331.

In Booker, the Supreme Court (1) held that sentence enhancements based solely on judicial fact-finding pursuant to the mandatory Sentencing Guidelines violated the Sixth Amendment, and (2) excised the provisions of the Sentencing Reform Act that made the guidelines mandatory – 18 U.S.C. §§ 3553(b)(1) and 3742(e) – thereby effectively rendering the Sentencing Guidelines advisory only. 543 U.S. at 233-35, 259-60, 125 S.Ct. at 749-51, 764. "As a result of Booker's remedial holding, Booker error exists when the district court misapplies the Guidelines by considering them as binding as opposed to advisory." Shelton, 400 F.3d at 1331.

Here, the district court committed an error that was plain by sentencing Johnson under a mandatory guidelines system. See id. (holding that a court commits Booker error by considering the Guidelines as binding and that Booker has made such error plain). However, Johnson cannot satisfy his burden under the third prong of plain-error review because he cannot establish a reasonable probability that he would have received a different sentence under an advisory scheme. At sentencing, the district court gave no indication that it was frustrated with the severity of the Guidelines. See United States v. Underwood, 446 F.3d 1340, 1344 (11th Cir. 2006) (noting that defendants have satisfied the third prong

21

of plain-error review in past cases by pointing to evidence that the district court "was frustrated with the severity of the Guidelines and sought to find a way to have a lower sentence imposed" and holding that the defendant failed to meet his burden, despite receiving a low-end sentence, because the record did not indicate that the court was frustrated with the severity of a guidelines sentence). In addition, the court found that Johnson's mid-range sentence was appropriate given the facts and circumstances of his case, which is inconsistent with the position that the court would have given him a lower sentence had it treated the Guidelines as advisory. See United States v. Curtis, 400 F.3d 1334, 1336 (11th Cir. 2005) (amending a footnote in a prior opinion to clarify that the defendant failed to meet the third prong of plain-error review because nothing suggested that the court would have imposed a lower sentence under advisory guidelines, especially given that the court sentenced him at the high end of the guideline range). Accordingly, Johnson cannot show a reasonable probability that he would have received a lower sentence had the court treated the range as advisory. Therefore, the district court did not plainly err under Booker in sentencing him under a mandatory guidelines system.

Johnson also argues that his sentence was unreasonable because the court failed to consider his mitigating factors. On appeal, he notes that he would have introduced Musta's testimony regarding the amount of drugs and alleged collusion

22

of prosecution witnesses, as well as evidence of his background and his role in the community. However, at his sentencing hearing, the court already had ruled on his motion for a new trial and was aware of the implications of Musta's letter, yet it determined that a mid-range sentence was appropriate. As to the other factors, Johnson merely identifies his background and role in the community and does not argue how these factors would have militated in favor of a lower sentence. Without more, Johnson cannot show a reasonable probability that his sentence would have been lower had the court considered these factors at sentencing. See Rodriguez, 398 F.3d at 1301.

Finally, Johnson alleges that the district court "utilized an improper and unproved sentencing enhancement" that resulted in an unconstitutional sentence. However, Johnson does not identify the allegedly improper sentencing enhancement, and he offers no supporting argument as to this allegation. As such, Johnson has abandoned any challenge to the court's use of an unidentified sentence enhancement. See United States v. Cunningham, 161 F.3d 1343, 1344 (11th Cir. 1994) (holding that the defendant abandoned an issue by failing to offer argument as to that issue on appeal). Accordingly, Johnson's arguments fail, and we affirm as to this issue.

**III.**

23

Because Johnson cannot establish that newly discovered evidence was more than mere impeaching evidence or would have produced a different outcome at trial, the district court did not abuse its discretion in denying his motion for a new trial without holding an evidentiary hearing. Johnson cannot show that the court committed plain error in sentencing him under a mandatory guidelines system because the court imposed a mid-range sentence and gave no indication that it was frustrated with the severity of the Guidelines. Accordingly, we affirm Johnson's convictions and sentences.

**AFFIRMED.**