[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2009
THOMAS K. KAHN
CLERK

No. 08-16374
Non-Argument Calendar

_____

D. C. Docket No. 03-00684-CR-1-TWT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

CORRY THOMPSON,
a.k.a. Larry Scott,
a.k.a. Corey Thompson,
a.k.a. Bobby Cook,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 30, 2009)

Before BLACK, CARNES and BARKETT, Circuit Judges.

PER CURIAM:

Corry Thompson appeals the district court's judgment denying him a new trial based on newly discovered evidence under Federal Rule of Criminal Procedure 33. Thompson also contends that his motion for a new trial at least merited an evidentiary hearing. We affirm.

## I.

The case against Thompson was based on evidence discovered by the Atlanta Police narcotics unit in a house on Palmetto Street that was searched in October 2003 and an apartment on Oglethorpe Avenue that was searched in October 2002. Each search, undertaken after a confidential informant purchased drugs at that location, turned up hundreds of grams of cocaine, along with crack cocaine, ecstasy, and guns. Thompson was charged with two counts of being a felon in possession of a firearm under 18 U.S.C. § 922(g) and § 924(e), two counts of possessing a firearm in furtherance of a drug trafficking crime under § 924(c), and seven counts of possession with intent to distribute cocaine, crack cocaine, marijuana, and ecstasy, all in violation of 21 U.S.C. § 841(a)(1), § 841(b)(1), and § 851. Thompson went to trial in April 2005 and was convicted by a jury on all counts. He was sentenced to life.

Thompson appealed, contending that there was insufficient evidence to connect him to the guns and drugs found in either location. We held that there was

2

plenty of evidence to connect Thompson to both the Palmetto Street house and the Oglethorpe Avenue apartment, and thus to connect him by constructive possession to the guns and drugs found at those addresses.  We affirmed his convictions. United States v. Thompson, 473 U.S. 1137, 1144 (11th Cir. 2006).

## II.

In April 2007, two members of the narcotics unit of the Atlanta police department pleaded guilty to federal civil rights violations after they killed an elderly woman in her (drug-free) home in November 2006.  To get a search warrant for that home, the officers had lied to the magistrate by saying that a confidential informant had purchased drugs at that address, when in fact they had been unable to get any informant to go there.  They also claimed that their imaginary informant had spotted surveillance equipment, justifying a no-knock warrant.  As the officers later rammed in her door, the terrified elderly woman fired a .38 pistol at them through the door; they returned fire and killed her.  An officer then planted marijuana in the house and supplied the cocaine that all of the officers claimed had been bought there.  It was a tragic example of police misconduct, but that is not the end of the story.  A federal investigation revealed that:

> In some, but not all, cases, while working as APD narcotics officers, Junnier, Smith, and other officers made false statements in sworn affidavits to state magistrate judges in order to procure search warrants for residences and other locations where the officers believed illegal drugs would be found.

3

These false statements included representations that Confidential Reliable Informants ("CRIs") had made drug purchases that never actually took place; that information was provided to officers by CRIs when the information was actually provided by unreliable informants, sometimes after officers threatened to falsely attribute illegal drugs to such informants; that the officers had personally observed a purchase by a CRI when they had not in fact observed the events described in the affidavit; that the CRIs were searched before and after drug purchases when CRIs were not searched; and that the occupants of the residence to be searched had surveillance cameras, were armed with firearms, or were dangerous in other ways to obtain "no-knock" warrants.

One of the officers who pleaded guilty to a role in the November 2006 shooting was Officer Junnier, who had also led the team that investigated and searched the Oglethorpe Avenue address in October 2002. Although Junnier did not procure the warrant for the Oglethorpe Avenue search, the officer who did get that warrant has since also pleaded guilty to conspiring to violate civil rights based on a warrantless search that occurred in October 2005.

Based on these events, Thompson filed a timely motion for a new trial under Federal Rule of Criminal Procedure 33. The district court denied the motion on multiple grounds. In short, because Officer Junnier's misconduct occurred years after the search in this case, the district court found that the newly discovered evidence was merely impeaching and that it would be inadmissible anyway under Rule 404(b). Moreover, Junnier's testimony had been corroborated by other officers and by a smorgasbord of physical evidence, meaning that Thompson could

4

not show that a new trial would probably produce a different result.  Accordingly, the district court denied Thompson's motion for a new trial and declined to order an evidentiary hearing.  This is Thompson's appeal.

**III.**

Thompson contends that he is entitled to a new trial because new evidence shows that Atlanta Police narcotics officers engaged in a pattern of illegal behavior during their investigations, including lying about confidential informants and planting evidence.  He argues that the recently discovered police misconduct supports his defense, which was that he never possessed any of the drugs, and that it likely would produce a different result by calling into question his guilt as well as the veracity of the informant and the officers who testified against him.  Thompson also argues that the district court erred by denying him discovery and an evidentiary hearing.

We review the district court's denial of Thompson's motion for a new trial pursuant to Rule 33, as well its decision to deny him an evidentiary hearing, only for abuse of discretion.  United States v. Vallejo, 297 F.3d 1154, 1163 (11th Cir. 2002);  United States v. Massey, 89 F.3d 1433, 1443 (11th Cir. 1996).

Rule 33 provides that "the court may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  "Motions for a

5

new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of justifying a new trial." United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc) (citation omitted). The court should only grant a such motion if the defendant shows that:

> (1) the evidence was discovered after trial, (2) the failure of the defendant to discover the evidence was not due to a lack of due diligence, (3) the evidence is not merely cumulative or impeaching, (4) the evidence is material to issues before the court, and (5) the evidence is such that a new trial would probably produce a different result.

United States v. Jernigan, 341 F.3d 1273, 1287 (11th Cir. 2003) (quotation omitted). "The failure to satisfy any one of these elements is fatal to a motion for a new trial." United States v. Lee, 68 F.3d 1267, 1274 (11th Cir. 1995).

**A.**

The district court did not abuse its discretion by deciding that Thompson had failed to demonstrate that a new trial "would probably produce a different result." Jernigan, 341 F.3d at 1287. First, the search of the Palmetto Street house in October 2003 remains above reproach. None of the officers who were later investigated for misconduct were involved in that search. A confidential informant testified at the trial that he had purchased drugs from Thompson himself at the Palmetto Street house. An officer testified that he observed Thompson entering the

6

house using a key and carrying a dog food bag that was later found full of drugs. Officers also observed Thompson leaving the Palmetto Street house and locking the door with his key. A few minutes later, when they pulled over Thompson's car, he threw the house keys onto the ground and walked away from them. Six or seven officers entered the Palmetto Street house, including not only Atlanta police but also a Georgia parole officer and an ATF agent. Both of these outside-agency officers provided corroborating testimony about the search and the drugs that were found there. None of the evidence and none of the officers involved in the Palmetto Street search have ever been called into question. Thus, there is certainly no showing that "a new trial would probably produce a different result" with regard to the six counts stemming from the Palmetto Street search. See Jernigan, 341 F.3d at 1287.

Thompson focuses instead on the Oglethorpe Avenue search. He contends that because the two officers primarily responsible for that search— Sergeant Stallings, who procured the warrant, and Officer Junnier, who led the search— were later convicted of civil rights violations involving warrantless searches, lying to magistrate judges, manslaughter, and planting evidence, that he has shown that a new trial would probably produce a different result. Thompson argues that United States v. Espinosa-Hernandez, 918 F.2d 911, 913–14 (11th Cir. 1990), requires a

new trial, or at least an evidentiary hearing.

In that case, the defendant had been convicted of conspiracy to import cocaine based on evidence from a drug sting headed by Customs Special Agent David Urso. Espinosa-Hernandez, 918 F.2d at 913. After the trial, Espinosa learned that Urso had made false statements to the grand jury and in an affidavit relating to Espinosa's case. Id. Urso had also been indicted for lying about his previous sale and use of drugs on his application to become a customs agent, and he was under investigation for distribution of cocaine and for aiding the escape of an incarcerated government informant. Id. Espinosa argued that Urso had played a key role in his conviction by testifying that Espinosa had been anxious to accept the cocaine, which Espinosa (who never possessed any of the drugs) had vigorously denied. Urso had also told the court that a witness Espinosa had sought was a government informant who was unavailable to testify. Id. In light of Urso's misconduct, we held that discovery might show "that Urso committed perjury in Espinosa's trial or a related proceeding" and stated that his testimony "had a tremendous impact" on the conviction. Id. at 913–14. We remanded the case for an evidentiary hearing concerning Urso's misconduct as it related to the new trial motion. Id. at 914.

Thompson's case is different. In Espinosa-Hernandez, we knew that Urso

8

had made false statements to the grand jury in that case and had submitted a false affidavit in that case. Moreover, Urso's misconduct, as shown by the investigation into his activities and his indictment, reached all the way back to the beginning of his service as a customs agent, meaning that his lies about his sales and use of drugs, as well as other possible misconduct, had occurred before the sting and trial that led to Espinosa's conviction. As we noted, that also raised the possibility that the U.S. Attorney's office had violated Bagley or Giglio by failing to disclose exculpatory or impeaching information. Id. at 914.

By contrast, in this case Officer Junnier and Sergeant Stallings' convictions were based on events that occurred in late 2005 and late 2006— three to four years after the Oglethorpe Avenue search and six to eighteen months after Thompson's trial. In other words, there is no evidence that the Atlanta narcotics officers committed any misconduct until more than three years after the Oglethorpe Avenue search. In fact, the confidential informant involved in both the Palmetto Street and Oglethorpe Avenue drug buys recently confirmed his 2005 testimony against Thompson in an interview with Thompson's counsel. That informant worked for at least five years with many police officers, including ones who were never investigated, and has made hundreds of drug buys.

Moreover, there remains substantial evidence of Thompson's role in the

Oglethorpe Avenue drug operation and thus of his guilt. When the six officers entered the Oglethorpe Avenue apartment, they found four people inside, as well as over 100 grams of cocaine, 50 grams of crack cocaine, 318 doses of ecstasy, two guns, baggies, and scales. The drugs were found in a safe, in both bedrooms, in a closet, and in the kitchen. Believing that six officers planted all of that evidence and photographed it in the presence of four suspects requires a big stretch of the imagination.

And in addition to the drugs, guns, and paraphernalia, the officers found "[d]ocuments that were undisputedly Thompson's," including three traffic citations that Thompson had received less than two miles from the Oglethorpe Avenue address and while driving a car owned by another occupant (who unquestionably was involved in the drug operation). Thompson, 473 F.3d at 1142–43. The police also found a Red Cross application filled out by Thompson and dated just one day before the search. Id. Finally, there was a list of phone numbers and nicknames— a drug dealer's address book— that matched Thompson's cell phone records. Id. All of these documents were found in one of the bedrooms, along with more than 100 grams of powder cocaine and 10 grams of crack. In addition to the amount of drugs, the paperwork that undoubtedly belonged to Thompson connected him to the Oglethorpe Avenue address and dispels any reasonable inference that the

10

evidence against him was somehow faked.

Finally, Thompson testified at his trial. About the Oglethorpe Avenue address, he first conceded that he had been in that apartment but on cross-examination denied that he had ever been there. Id. at 1143. The government presented evidence that Thompson had six prior felony convictions, as well as evidence that he had repeatedly lied to police about his identity and had given false testimony in an earlier hearing in this same case. Id. at 1143.

In sum, there is plenty of evidence to dispel any concern that Officer Junnier or any other officer planted the evidence against Thompson. Notably, Thompson does not even argue that the evidence against him was fabricated; instead, he argues essentially that he could impeach the officers in a new trial in light of their later misconduct. But to the extent that is his goal, under Jernigan impeachment evidence alone is not enough to merit a new trial. 341 F.3d at 1287. In any event, Thompson would not be entitled to a new trial so that he may impeach a witness based on that person's actions that occurred after his original trial. Thompson, in effect, is arguing that his first trial was unfair because the police did not testify that they would, years later, commit crimes and other misconduct in similar cases. That is not a reason for a new trial.

**B.**

11

Nor did the district court abuse its discretion in denying Thompson his requested discovery and an evidentiary hearing. As Thompson admits, the district court has discretion to decide the motion for a new trial without a hearing. United States v. Schlei, 122 F.3d 944, 994 (11th Cir. 1997) ("[T]he acumen gained by a trial judge over the course of the proceedings" makes the same court "well qualified" to rule on a motion for a new trial based on new evidence without an evidentiary hearing.).

In United States v. Slocum, 708 F.2d 587 (11th Cir. 1983), we held that:

> [W]e find ourselves in agreement with the decision on the merits of the new trial motion and where the defendants failed to file even an affidavit by [] the person whose post-trial statement clearly came the closest to requiring a new trial, we hold that the trial court did not abuse its discretion in denying the motion without an evidentiary hearing.

Id. at 600. In this case, Thompson has not filed any affidavits supporting his new trial motion. Instead, Thompson discloses that he has interviewed one of the police officers and the confidential informant and that both confirmed their 2005 testimony and denied any wrongdoing by anyone with regard to the Palmetto Street and Oglethorpe Avenue searches.[1] Thompson has found nothing at all to connect the officers' misconduct during 2005 and 2006 to the Oglethorpe Avenue

---

[1] The defense also contacted Officer Junnier who, through his attorney, declined to comment.

12

search in 2002.[2]  Thus, it is hard to see what could be achieved by holding an evidentiary hearing, especially because the same district judge who presided over his trial decided the motion for a new trial.

In light of the "highly disfavored" nature of new trial motions, see Campa, 459 F.3d at 1151, the district court did not abuse its discretion by concluding that Thompson failed to show that the new evidence probably would change the result of his trial.  For that reason, and because the same judge presided over both Thompson's trial and his Rule 33(a) motion, the district court was well qualified to rule on that motion without a hearing, and it did not abuse its discretion by declining to order discovery.  Therefore we affirm.

**AFFIRMED.**

---

[2]  Thompson relies on United States v. Fernandez, 136 F.3d 1434, 1437–38 (11th Cir. 1998), but importantly, in that case the police misconduct occurred "during the relevant time period."