[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13324
_____

D.C. Docket No. 1:08-cr-20044-JAL-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JUAN RENE CARO,
MAYTEMAR CORPORATION,
d.b.a. La Bamba Check Cashing,

Defendants - Appellants.
_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 29, 2014)

Before TJOFLAT, JULIE CARNES, and GILMAN,* Circuit Judges.

_____

* Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting
by designation.

GILMAN, Circuit Judge:

In 2009, a jury convicted Juan Rene Caro and his company, La Bamba Check Cashing (collectively, Caro) on multiple charges related to a money-laundering scheme. Two years later, Caro found out that one of the witnesses against him, Nevin Kerry Shapiro, was himself under investigation in New Jersey for a similar fraud scheme at the time of Caro's trial.

This discovery prompted Caro to move for a new trial in the district court on two grounds: (1) that Shapiro's conviction constitutes "new evidence" because Shapiro's plea colloquy reveals that he perjured himself in Caro's trial, and (2) that the government violated its *Brady* and *Giglio* obligations by failing to disclose the investigation against Shapiro. Caro also moved to compel discovery as to what the U.S. Attorney's Office in Florida knew about the New Jersey investigation and when it acquired such knowledge.

The district court denied both motions because it was already familiar with the case and because it determined that Shapiro's testimony was not material to the conviction. Caro now appeals. For the reasons set forth below, we **AFFIRM** the judgment of the district court.

2

# I. BACKGROUND

## A.    Trial and direct appeal

On direct appeal, this court set out the facts underlying Caro's conviction as follows:

> During the building boom in South Florida in the early 2000s, many within the construction industry played fast and loose with federal and state regulations to maximize profits and minimize taxes. These companies were able to find willing partners in this pursuit, and Juan Rene Caro ("Caro") was accused of being one of these partners. Caro's scheme allegedly involved using fictitious or "shell" construction corporations to avoid taxes and insurance costs.

> Normally, employers withhold from employees' paychecks monies paid into the federal treasury [for] social security and payroll taxes. These legitimate construction companies, however, were trying to avoid these "obstacles," so that they could employ illegal aliens. One cannot simply write a payroll check to an illegal alien, as such employment is illegal. In addition, these illegal aliens could not open legitimate bank accounts where they could either deposit or cash paychecks.

> If the alleged scheme worked properly, all of these "obstacles" would be overcome. A legitimate construction company would be approached by Caro or an associate and offered an alternative to paying the taxes and insurance costs associated with employees. Rather than pay employees by check, the legitimate construction company would write a check to a shell corporation making it appear that the shell company was a subcontractor and the employer of the legitimate construction company's employees.

> The shell corporation would allegedly cash that check at Caro's check cashing store, or another check cashing store. A percentage of the face value of the check was "charged" as a fee, with the remaining cash returned to the shell corporation. The shell corporation, in turn,

3

provided the cash to the legitimate construction company. The cash, in its final voyage of the journey, was payed [sic] to employees, including illegal aliens.

In addition to evading payroll taxes, the scheme allegedly allowed the legitimate corporation to avoid the expense of workers' compensation insurance. This was accomplished when the shell company fraudulently procured workers' compensation insurance and permitted the legitimate company's employees to work under that insurance certificate.

The shell companies, on the other hand, were then left holding the bag. They were responsible for the payroll taxes and insurance premiums but never paid them. Instead, when all the unpaid taxes and premiums drew scrutiny, usually within a year or eighteen months, the shell company simply dissolved leaving these debts unpaid. Another shell company would quickly be incorporated and the cycle would begin anew.

The flaw in Caro's scheme was underestimating the Internal Revenue Service ("IRS"). Financial institutions are required to complete and file with the IRS a currency transaction report ("CTR") for currency transactions involving more than $10,000. Caro allegedly made material misrepresentations in the CTRs for the transactions with these shell companies, which eventually led to him being investigated by the IRS and being charged in this case.

*United States v. Caro*, 454 F. App'x 817, 819-20 (11th Cir. 2012), *cert. denied*, 133 S. Ct. 204 (2012).

A grand jury indicted Caro and four coconspirators for violating the currency-transaction reporting requirements of 31 U.S.C. §§ 5313(a), 5324(a)(2), and 5324(d)(2).  The conspirators allegedly filed false CTRs totaling more than

4

$132.7 million, and the indictment alleged twenty-one overt acts in furtherance of the conspiracy, none of which involved Shapiro.

Following a lengthy trial that lasted from November 2008 until February 2009, the jury returned guilty verdicts against Caro on most of the charges. The district court sentenced him to 216 months in prison. La Bamba was placed on probation for five years. Caro appealed, arguing that that the district court committed numerous reversible errors. This court disagreed, affirming both the convictions and the sentences in 2012. It also extensively detailed the evidence presented during the trial proceedings.

## B.    Motion for new trial

In January 2011, while his appeal was still pending, Caro filed a motion for a new trial under Rule 33 of the Federal Rules of Criminal Procedure. He moved six months later to compel discovery and for an evidentiary hearing in support of the new-trial motion. These motions stemmed from allegations that the government knew of a pending investigation against one of its witnesses at trial, Nevin Kerry Shapiro, but had failed to disclose the investigation as potentially impeaching information. This court summarized Shapiro's testimony as follows:

> In early 2007, when Caro met Nevin Kerry Shapiro at a Miami Heat basketball game, he offered Shapiro a loan of $7,000 cash with no terms. Shapiro testified that Caro[,] who had the cash on his person, gave the money to Shapiro with only a handshake to seal their

5

agreement. Shapiro was to repay the money with a $500 fee. Shapiro repaid the loan by writing a check for $7,523.23 from his real estate company to [a shell company], at Caro's direction.

Shapiro then borrowed $50,000 from Caro in October 2007 and repaid the loan by writing a personal check for $52,500 to [another shell company]. The $2,500 represented interest on the loan and Shapiro did not endorse the check before personally delivering it to Caro.

The loans from Caro and repayments from Shapiro continued for five more transactions. Caro sent someone to Shapiro's office to pick up Shapiro's check or Shapiro gave the check to Caro personally at a Heat game or by visiting La Bamba. To repay the loans, Shapiro wrote checks to AFC Painting and Huber, entities who had never performed any work for him, and finally, to La Bamba. Although Caro insisted that the other companies Shapiro had written the checks to were "his," Shapiro was uncertain about the others. Caro agreed reluctantly to permit Shapiro to write the final two checks, one for $50,000 and one for $52,000, directly to La Bamba.

*Caro*, 454 F. App'x at 835. This court's opinion did not discuss Shapiro's testimony any further and did not reference it when analyzing the sufficiency of the evidence supporting Caro's convictions.

Shapiro initially became involved in the IRS investigation of La Bamba when an IRS agent came across several high-dollar checks written by Shapiro to one of the shell companies. (R. 627, Dist. Ct. Op. at 4) At the same time, one of Shapiro's companies, Capital Investments, Inc., was under investigation in New Jersey by the Federal Bureau of Investigation (FBI). (*Id.* at 5) Shapiro was running a Ponzi scheme at the time and using his ill-gotten gains to pay gambling

6

debts and give lavish gifts to college athletes. (*Id.* at 5-6)  He was using the funds from new investors to make payments to previous investors.  (*Id.* at 5)  Shapiro also incurred various gambling debts, which apparently supplied the motive for Shapiro to borrow money from Caro and repay La Bamba.  (*Id.* at 4)  In September 2010, Shapiro pleaded guilty to fraud charges resulting from these activities.  (*Id.*)

The thrust of Caro's motions for an evidentiary hearing and a new trial was that the government had an obligation to disclose the pending investigation of Shapiro earlier and that, with all of the evidence surrounding Shapiro's Ponzi scheme at its disposal, Caro would have been able to obtain an acquittal by effectively impeaching Shapiro.   In particular, Caro argued that Shapiro's testimony provided "direct substantiation of the government's theory" against Caro and that Shapiro was "the sole, unimpeached witness."  (*Id.* at 7)

Caro therefore argued that, without Shapiro's testimony, the government's case would have crumbled.  He sought to further his claims by taking discovery from the Securities and Exchange Commission (SEC), the FBI, the IRS, the United States Attorney's Offices in both the District of New Jersey and the Southern District of Florida, Capital Investments' bankruptcy trustee, and a journalist.  (*Id.* at 8)

7

The district court rejected these arguments. It first concluded that "Shapiro's fraud conviction in the District of New Jersey and allegedly perjured testimony at trial, if known, would not have been exculpatory as to Caro or La Bamba. Instead, it would have been impeachment material." (*Id.* at 12) The court then analyzed the testimony to determine if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Id.* at 15) (quoting *United States v. Dickerson*, 248 F.3d 1036, 1041-42 (11th Cir. 2009)).

Shapiro's testimony failed to meet this standard for a couple of reasons. The district court first pointed out that the only testimony that was clearly perjured related to Shapiro's occupation and business purpose. (*Id.* at 15) It also found that the substance of Shapiro's testimony went only to show that Caro "knowingly provide names of fictitious shell companies." (*Id.*) At least four other witnesses testified to this same point. (*Id.* at 15-16) The court therefore denied Caro's motion for a new trial. It further determined that Caro was not entitled to an evidentiary hearing because the purported new evidence, even if accepted, was not material enough to overturn the jury verdict against him. (*Id.* at 17-18)

8

Caro moved for reconsideration on fifteen grounds. The district court again denied him discovery and a new trial. (R. 644, Dist. Ct. Op.) This timely appeal followed.

## II.  ANALYSIS

### A.    Standard of review

We review the district court's denial of both the motion for a new trial and the motion to compel discovery under the abuse-of-discretion standard. *See United States v. Thompson*, 335 F. App'x 876, 879, 882 (11th Cir. 2009) (citing *United States v. Vallejo*, 297 F.3d 1154, 1163 (11th Cir. 2002)) (addressing both types of motions).

### B.  Discussion

Because the district court would be entitled to consider any new discovery before ruling on the motion for a new trial, we will assume without deciding that the question of discovery should be considered first. We will thus begin our analysis there.

> ### 1. Caro is not entitled to discovery or an evidentiary hearing on his motion for a new trial because the trial judge was well-qualified to rule on the motion without a hearing

The district court has the discretion to deny a motion for post-trial discovery or an evidentiary hearing on a motion for a new trial if "the acumen gained by a

9

trial judge over the course of the proceedings [makes her] well qualified to rule on the basis of affidavits without a hearing." *United States v. Schlei*, 122 F.3d 944, 994 (11th Cir. 1997) (quoting *United States v. Hamilton*, 559 F.2d 1370, 1373-74 (5th Cir. 1977)). In fact, motions for a new trial can "ordinarily be decided upon affidavits," with evidentiary hearings ordered only when they are necessary "because of certain unique situations typically involving allegations of jury tampering, prosecutorial misconduct, or third party confession." *United States v. Johnson*, 305 F. App'x 524, 529 (11th Cir. 2008) (quoting *Hamilton*, 559 F.2d at 1373)).

No such situations are present here. As discussed in more detail below, the key issue in Caro's motion for a new trial is whether the new evidence would likely have resulted in a different outcome. District Judge Joan Lenard, who ruled upon Caro's motion, also presided over his trial and was thus "already familiar with the evidence and the demeanor of the witnesses." *See United States v. Mitchell*, No. 13-14893, 2014 WL 2853845, at *2 (11th Cir. June 24, 2014). Under these circumstances, "it was not necessary for the court to conduct an evidentiary hearing before ruling on [Caro's] motion." *Id. See also United States v. Marti*, 317 F. App'x 948, 950 (11th Cir. 2009) ("The district court presided over

10

Marti's trial and was sufficiently familiar with the case to determine that Marti's new evidence was not material to his defense.").

### 2. Caro is not entitled to a new trial because the newly discovered evidence would not have altered the outcome of the case

We turn next to the multi-faceted motion for a new trial. Although Caro's argument for a new trial stems from one new "fact"—the prosecutor's failure to disclose that a government witness was under investigation for fraud in another district—it relies on three distinct legal theories: (1) that a new trial is warranted under Rule 33(b)(1) of the Federal Rules of Criminal procedure based on newly discovered evidence, (2) that a new trial is warranted because the government violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and (3) that a new trial is warranted because the government violated its obligations under *Giglio v. United States*, 405 U.S. 150 (1972). Each of these theories requires the court to apply a distinct test.

To prevail on a garden-variety motion for a new trial under Rule 33, Caro would have to meet a five-part test:

> (1) the evidence must be discovered following trial; (2) the movant must show due diligence to discover the evidence; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to issues before the court; and (5) the evidence must be of such a nature that a new trial would probably produce a new result.

11

*United States v. Hall*, 854 F.2d 1269, 1271 (11th Cir. 1988).

To be granted a new trial based on the government's violation of its *Brady* obligations, Caro would have to meet a four-part test:

> (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.

*United States v. Vallejo*, 297 F.3d 1154, 1164 (11th Cir. 2002).

Finally, to obtain a new trial under *Giglio*, Caro would need to meet a two-part test: "(1) that the prosecution used or failed to correct testimony that [it] knew or should have known was false and (2) materiality—that there is any reasonable likelihood the false testimony could have affected the judgment." *Rodriguez v. Sec'y, Fla. Dep't of Corr.*, 756 F.3d 1277, 1302 (11th Cir. 2014). The undisclosed impeaching evidence, in other words, must be sufficiently important as to "put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Dickerson*, 248 F.3d 1036, 1041 (11th Cir. 2001) (quoting *Strickler v. Greene*, 527 U.S. 263, 290 (1999)).

Although the full requirements of each test are distinct, each requires that there be a reasonable likelihood that the new information would have affected the outcome of the case. Because each of the tests for a new trial requires Caro to

12

meet every prong, his failure to prove this one element would be fatal to his claim under all three theories.

The district court in the present case found that "[w]ith Shapiro's testimony relevant to such a slim portion of the charges against Defendants, no showing can be made that 'a new trial would probably produce a different result.'" (R. 627, Dist. Ct. Op. at 16) (quoting *United States v. Jernigan*, 341 F.3d 1273, 1287 (11th Cir. 2003)). When asked to reconsider its decision, the court once again recounted the "overwhelming" evidence against Caro and reaffirmed that the new information regarding Shapiro's fraud investigation and related perjured testimony "was not material." (R. 644, Dist. Ct. Op. at 24-27).

We owe substantial deference to the district court's conclusion. *See United States v. Horton*, 622 F.2d 144, 147 (5th Cir. 1980) (highlighting the importance of "deference to the trial judge, who has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record") (quoting *Massey v. Gulf Oil. Corp.*, 508 F.2d 92, 95-95 (5th Cir. 1975)). The district judge sat through the entire three-month trial. She heard every witness, reviewed every exhibit, and had the benefit of hearing both opening and closing arguments to put the evidence in perspective. She is therefore in a

13

significantly better position than this court to determine the potential impact of Shapiro's impeachment.

Caro nevertheless spends almost ten pages of his brief rehashing his belief in a "wholly probable" different result if he had been armed with information about Shapiro's investigation. (Appellant Br. at 33-43) He argues that the district court "ignored how important witness credibility was," "failed to recognize the invalidity of the entire theory of the prosecution," and did not properly account for "the extent of Shapiro's wrongdoing and the ongoing government investigation of him, in light of its impact on both the testimony he provided and the integrity of the proceedings." (*Id*. at 39-41)

In support of his argument, Caro primarily relies on *United States v. Espinosa-Hernandez,* 918 F.2d 911 (11th Cir. 1990). The newly discovered evidence in that case consisted of the government's lead agent being investigated for "both his participation in the escape from federal custody of an incarcerated confidential government informant and his alleged distribution of cocaine." *Id.* at 913. Furthermore, the agent was indicted for making false statements regarding his past use and sale of drugs. The district court denied the defendant's motions for a new trial and an evidentiary hearing because the evidence was deemed merely impeaching and unlikely to result in a different outcome at trial.

14

This court disagreed.    It pointed out that the agent's testimony in *Espinosa-Hernandez* directly contradicted the defendant's on a determinative question of fact, untouched by other witnesses.    *Id.* at 914.    The court further reasoned that if the jury sided with the agent on this critical point, the jury may have been unwilling to believe other aspects of the defendant's testimony.    *Id.*    It also noted that the agent "was alone responsible for persuading the grand jury that a single conspiracy existed," and that a critical defense witness was deemed unavailable based on the agent's representations to the court.    *Id.*    Because so many facets of the defendant's conviction hinged on the agent's credibility, this court determined that "it [was] too soon to declare out of hand that the new evidence will not require a new trial" and remanded the case for discovery and an evidentiary hearing on the matter.    *Id.*

In subsequent cases, this court has often distinguished *Espinosa-Hernandez* on its facts.    The court in *United States v. Johnson*, 305 F. App'x 524 (11th Cir. 2008), for example, distinguished *Espinosa-Hernandez* based on the relative insignificance of the evidence in question, the abundance of additional witness testimony, and the fact that the defendant in *Johnson* was not deprived of his ability to present witnesses due to the testimony of the questionable witness. *Id.* at 530-31.    A similar distinction was drawn in *United States v. Collins*, 521 F. App'x

15

855 (11th Cir. 2013), where the court concluded that the plethora of evidence corroborating the now-dubious testimony supported the district court's conclusion that the new evidence was unlikely to alter the verdict. *Id.* at 862.   Likewise, in *United States v. Thompson*, 335 F. App'x 876 (11th Cir. 2009), the court affirmed the trial court's conclusion that new evidence relating to the investigating agent's credibility was unlikely to result in a different outcome at trial because of the "substantial evidence" of the defendant's guilt. *Id.* at 881.

The circumstances in the present case are much closer to *Johnson, Collins,* and *Thompson* than to *Espinosa-Hernandez.*   As the district court pointed out, Shapiro's testimony addressed only a "slim portion" of the case against Caro (R. 627, Dist. Ct. Op. at 16) and there was "overwhelming" evidence of Caro's guilt (R. 644, Dist. Ct. Op. at 24-27).   Caro's differing opinion about the weight of Shapiro's testimony does not justify reversal.   The district court discussed Shapiro's testimony at length, placed it in context with the other evidence presented, and concluded that the new information would cause no change in the overall result.

We review that decision under the abuse-of-discretion standard, which allows for a "range of possible conclusions . . . unless the district court has made a clear error of judgment, or has applied the wrong legal standard." *United States v.*

16

*Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).  No such error is present here.

## III.  CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.

17